# WATT, SECRETARY OF THE INTERIOR, ET AL. *v.* ALASKA

No. 79–1890.  Argued January 13, 1981—Decided April 21, 1981*

---

*Together with No. 79–1904, *Kenai Peninsula Borough* v. *Alaska et al.,* also on certiorari to the same court.

POWELL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 273. STEWART, J., filed a dissenting opinion, in which BURGER, C. J., and MARSHALL, J., joined, *post*, p. 276.

*Deputy Solicitor General Claiborne* argued the cause for petitioners in No. 79–1890. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Moorman,* and *Dirk D. Snel. Charles K. Cranston* argued the cause and filed briefs for petitioner in No. 79–1904.

*G. Thomas Koester,* Assistant Attorney General of Alaska, argued the cause for respondents in both cases. With him on the brief was *Wilson L. Condon,* Attorney General.

JUSTICE POWELL delivered the opinion of the Court.

The narrow issue presented by these cases is which of two federal statutes provides the formula for distribution of revenues received from oil and gas leases on national wildlife refuges reserved from public lands.

## I

The Kenai National Moose Range was created in 1941 by the withdrawal of nearly two million acres from public lands on the Kenai Peninsula in Alaska. See Exec. Order No. 8979, 3 CFR 1043 (1938–1943 Comp.). See also Public Land Order No. 3400, 29 Fed. Reg. 7094–7095 (1964) (adjusting the boundaries). The Kenai Moose Range, as its name suggests, provides a refuge and breeding ground for moose. The Fish and Wildlife Service in the Department of the Interior administers it as part of the national wildlife refuge system.

Commercially significant quantities of oil underlie the Kenai Moose Range.[1] Pursuant to authority under the Mineral Leasing Act of 1920, 30 U. S. C. § 181 *et seq.*, the Secretary of the Interior issued oil and gas leases for the Kenai Moose Range, beginning in the mid-1950's. See *Udall* v. *Tallman*, 380 U. S. 1 (1965). The United States has received substantial revenues from these leases.[2] From first receipt in 1954, the Secretary has distributed these revenues according to the formula provided in § 35 of the Mineral Leasing Act of 1920, 41 Stat. 450, as amended, 30 U. S. C. § 191. This formula prescribes that 90% of the revenues be paid to the State of Alaska and 10% to the United States Treasury.[3]

---

[1] Today, the Kenai Moose Range is the only national wildlife refuge created from public lands where oil is being pumped. See Brief for Federal Petitioners 4, n. 4. Substantial quantities of oil, however, are thought to underlie other reserved refuge lands in Alaska.

[2] Between 1966 and 1976, Kenai Range generated more than $57 million in oil lease revenues. App. 64. In 1964, Kenai Range generated more than $3.8 million in revenues from oil and gas leases. In that same year, refuges on reserved public land in the contiguous 48 States generated $3,143 in oil and gas revenues. App. to Brief for Federal Petitioners 1a–2a. In interpreting Congress' directions for distribution of oil revenues from reserved refuge lands, it should be remembered that historically Kenai alone has generated such revenues.

[3] In pertinent part, the current § 35, as set forth in 30 U. S. C. § 191, provides:

"All money received from sales, bonuses, royalties, and rentals of the public lands under the provisions of this chapter . . . shall be paid into the Treasury of the United States; . . . of those from Alaska . . . 90 per centum thereof shall be paid to the State of Alaska for disposition by the legislature . . . ."

States other than Alaska receive only 50% of public land mineral revenues under the Act. *Ibid.*

By its terms, the Mineral Leasing Act applies to specified minerals, including oil and gas, on all lands owned by the United States, except those lands excluded by the Act. 30 U. S. C. § 181. See *Udall* v. *Tallman*, 380 U. S. 1, 4, and n. 3 (1965).

In 1975, the Director of the Fish and Wildlife Service inquired of the Solicitor of the Department of the Interior whether revenues from oil and gas leases in wildlife refuges created by withdrawal of public lands should be distributed according to § 401 (c) of the Wildlife Refuge Revenue Sharing Act, 49 Stat. 383, as amended, 16 U. S. C. § 715s (c), rather than under the Mineral Leasing Act of 1920. The Director's inquiry was prompted by the 1964 amendments to § 401 (a), which added the word "minerals" to a list of refuge resources, the revenues from which were to be distributed according to the statutory formula.[4] Pub. L. 88–523, 78 Stat. 701. According to this formula, 25% of the revenues are paid to counties wherein the refuge lies, and remaining funds are used by the Department of the Interior for public purposes.[5]

---

[4] Prior to 1964, § 401 governed distribution of revenues from "the sale or other disposition of surplus wildlife, or of timber, hay, grass, or other spontaneous products of the soil, shell, sand, or gravel, and from other privileges on refuges." Act of June 15, 1935, ch. 261, 49 Stat. 378, 383. The current version of § 401 (a) is given in the text, *infra*, at 265.

[5] Section 401 (c) currently provides:

"(1) The Secretary shall pay out the fund, for each fiscal year . . . , to each county in which is situated any fee area whichever of the following amounts is greater:

"(A) An amount equal to the product of 75 cents multiplied by the total acreage of that portion of the fee area which is located within such county.

"(B) An amount equal to three-fourths of 1 per centum of the fair market value, as determined by the Secretary, of that portion of the fee area . . . which is located within such county.

"(C) An amount equal to 25 per centum of the net receipts collected by the Secretary in connection with operation of and management of such fee area during the fiscal year . . . .

"(2) At the end of each fiscal year the Secretary shall pay out of the fund for such fiscal year to each county in which any reserve area is situated, an amount equal to 25 per centum of the net receipts collected by the Secretary in connection with the operation and management of such area during such fiscal year . . . ." 16 U. S. C. § 715s (c) (1976 ed., Supp. III).

Section 401 (b) allows the Secretary to pay any expenses related to revenue production or distribution from this fund. Section 401 (e) pro-

The Solicitor ruled that the 1964 amendment governed, superseding § 35 of the Mineral Leasing Act of 1920. App. to Pet. for Cert. in No. 79–1890, p. 26a. The Comptroller General concurred in the view of the Solicitor. 55 Comp. Gen. 117 (1975). Upon request for reconsideration by the State of Alaska in 1976, the Comptroller General affirmed his initial decision. See Op. Comp. Gen. in File: B–118678, June 11, 1976, reprinted in App. to Pet. for Cert. in No. 79–1890, p. 42a.

The Kenai Peninsula Borough then brought suit against the Secretary of the Interior in the United States District Court for the District of Alaska, seeking a declaration that the amended § 401 (a) of the Wildlife Refuge Revenue Sharing Act governed the distribution of oil and gas revenues from the Kenai Moose Range. Kenai Borough is the "county" within which the Moose Range lies. If § 401 (a) governs, it will receive 25% of the revenues and the State none. The State of Alaska then filed suit in the same court against the Secretary and various federal officials, seeking a declaration that § 35 of the Mineral Leasing Act still governed distribution of these same oil and gas revenues. If that provision applies, the State will continue to receive 90% of the funds and, so far as federal law is concerned, Kenai Borough none. The District Court consolidated the lawsuits.[6]

The District Court granted summary judgment for the State of Alaska. 436 F. Supp. 288 (1977). Upon exami-

---

vides that funds remaining after expenses and the States are paid are transferred to the Migratory Bird Conservation Fund, established for the laudable purpose of purchasing migratory bird refuges.

[6] Since this litigation commenced in 1976, 90% of oil and gas revenues from the Kenai Range has been paid into an escrow account that now contains more than $23 million. Brief for Federal Petitioners 4, n. 4. In addition to declaratory relief, Kenai Borough sought an accounting of revenues paid to the State since 1964 under the Mineral Leasing Act of 1920 but allegedly due the Borough, and recovery of such payments. The State sought a resumption of accustomed payments under the Mineral Leasing Act.

nation of the apparently conflicting statutes, the court held that the term "minerals" in the amended Wildlife Refuge Revenue Sharing Act referred only to oil and gas found on land *acquired* for wildlife refuges. *Id.*, at 292. Distribution of oil and gas revenues from leases on public land *reserved* for wildlife refuges, it held, continues to be determined by § 35 of the Mineral Leasing Act of 1920.[7] *Ibid.* The court viewed the legislative history of the 1964 amendments as demonstrating that Congress was concerned primarily with the difficulties of acquiring land for refuges and that Congress expected no increase in revenues from the Kenai Moose Range to result from the amendments. *Id.*, at 291–292.

The Court of Appeals for the Ninth Circuit affirmed. 612 F. 2d 1210 (1980). That court found the legislative history largely ambiguous. *Id.*, at 1213. It refused to find that the addition of the word "minerals" to the amended Wildlife Refuge Revenue Sharing Act had repealed by implication the Mineral Leasing Act of 1920 without a clear showing that this was the intent of Congress. See *Morton* v. *Mancari*, 417 U. S. 535, 549–551 (1974). The court further approved the District Court's holding because it gave effect to each statute. 612 F. 2d, at 1214–1215.

We granted certiorari. *Sub nom. Andrus* v. *Alaska*, 449 U. S. 818 (1980).[8] We now affirm.

---

[7] In general, "acquired lands are those granted or sold to the United States by a State or citizen and public domain lands were usually never in state or private ownership." *Wallis* v. *Pan American Petroleum Corp.*, 384 U. S. 63, 65, n. 2 (1966). The Mineral Leasing Act of 1920 applies only to public lands. *Id.*, at 65.

[8] In 1978, Congress rejected new amendments to § 401 (a) that would have defined minerals as "including, but not limited to, crude petroleum and natural gas." H. R. 8394, 95th Cong., 2d Sess. (1978). The House Report recommending this bill stated that the language was added to "insure" that after the effective date oil and gas revenues from Kenai would be distributed according to the formula in § 401 (c). H. R. Rep. No. 95–1197, p. 8 (1978). The Report disclaims any intention to affect

## II

The Secretary and the Kenai Borough rely primarily on the "plain language" of § 401 (a) of the Wildlife Refuge Revenue Sharing Act. They contend that it provides without ambiguity that mineral resources from all national wildlife refuges be distributed according to the formula described in § 401 (a) of the Act. As currently phrased, § 401 (a) provides:

"[A]ll revenues received by the Secretary of the Interior from the sale or other disposition of animals, salmonoid carcassas [sic], timber, hay, grass, or other products of the soil, minerals, shells, sand, or gravel, [or] from other privileges . . . shall be . . . reserved in a separate fund for disposition as hereafter prescribed." 16 U. S. C. § 715s (a) (1976 ed., Supp. III).

The provision defines the wildlife refuge system to include lands "acquired or reserved" for conservation and protection of certain fish and wildlife. No restriction is placed upon the common meaning of "minerals." Given this clarity, it is argued, resort to the legislative history is unnecessary or improper.

We agree with the Secretary that "[t]he starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S.

---

the outcome of these cases, then pending in the Court of Appeals. *Ibid.* The Senate then rejected even this amendment, Members stating that it would be inappropriate to make any judgment about the proper allocation of these resources while these cases were still in the courts. 124 Cong. Rec. 31436–31440 (1970) (remarks of Sen. Culver and Sen. Gravel).

The sole issue that has been before the courts during this five years of litigation is the intent of Congress in adding the single term "minerals" to the statute in 1964. Congress declined to clarify its intent in 1978. Accordingly, we are left to resolve by judicial construction what should be addressed as a question of legislative policy judgment: the appropriate distribution among federal, state, and local governments of natural resource revenues.

723, 756 (1975) (POWELL, J., concurring). See *Rubin* v. *United States,* 449 U. S. 424 (1981). But ascertainment of the meaning apparent on the face of a single statute need not end the inquiry. *Train* v. *Colorado Public Interest Research Group,* 426 U. S. 1, 10 (1976); *United States* v. *American Trucking Assns., Inc.,* 310 U. S. 534, 543–544 (1940). This is because the plain-meaning rule is "rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists." *Boston Sand Co.* v. *United States,* 278 U. S. 41, 48 (1928) (Holmes, J.).[9] The circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect. *E. g., Church of the Holy Trinity* v. *United States,* 143 U. S. 457, 459 (1892); *United States* v. *Ryan,* 284 U. S. 167, 175 (1931).

Sole reliance on the "plain language" of § 401 (a) would assume the answer to the question at issue. These cases involve two statutes, each of which by its literal terms applies to the facts before us. Restatement of the terms of § 401 (a) cannot answer which statute Congress intended to control. Recognizing this, the Secretary invokes the maxim of construction that the more recent of two irreconcilably conflicting statutes governs. 2A C. Sands, Sutherland on Statutes and Statutory Construction § 51.02 (4th ed. 1973). Without depreciating this general rule, we decline to read the statutes as being in irreconcilable conflict without seeking to ascertain the actual intent of Congress. Our examination of the

---

[9] "Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell* v. *Markham,* 148 F. 2d 737, 739 (CA2) (L. Hand, J.), aff'd, 326 U. S. 404 (1945).

legislative history is guided by another maxim: " 'repeals by implication are not favored,' " *Morton* v. *Mancari*, 417 U. S., at 549, quoting *Posadas* v. *National City Bank,* 296 U. S. 497, 503 (1936). "The intention of the legislature to repeal must be 'clear and manifest.' " *United States* v. *Borden Co.,* 308 U. S. 188, 198 (1939), quoting *Red Rock* v. *Henry,* 106 U. S. 596, 602 (1883). We must read the statutes to give effect to each if we can do so while preserving their sense and purpose. *Mancari, supra,* at 551; see *Haggar Co.* v. *Helvering,* 308 U. S. 389, 394 (1940).

## III

Congress gave extensive consideration to the purpose and probable effect of the 1964 amendments to the Wildlife Refuge Revenue Sharing Act. Pub. L. 88–523, 78 Stat. 701. Nonetheless, and we think it significant, there is no explanation in the legislative history for the addition of the single word "minerals" to the list of refuge resources subject to the Act. See H. R. Rep. No. 1753, 88th Cong., 2d Sess. (1964) (hereinafter 1964 H. R. Rep.); S. Rep. No. 1096, 88th Cong., 2d Sess. (1964) (hereinafter 1964 S. Rep.); 110 Cong. Rec. 19882–19883 (1964) (remarks of Rep. Ostertag). Our study of the few legislative materials pertinent to the insertion of "minerals" persuades us that Congress intended to work no change in the pre-existing formula for distribution of mineral revenues from federal wildlife refuges.

## A

Prior to 1964, § 35 of the Mineral Leasing Act of 1920 governed distribution of revenues from mineral leases on wildlife refuges withdrawn from public lands. This conclusion cannot be seriously questioned. First, from the time the first mineral revenues were generated on such lands until well after 1964, the Secretary invariably distributed the revenues as provided in the Mineral Leasing Act. Second, the Comptroller General long ago ruled that the only other arguably

applicable statute, the then unamended Wildlife Refuge Revenue Sharing Act, Act of June 15, 1935, ch. 261, 49 Stat. 383 (hereinafter 1935 Refuge Act), see n. 4, *supra,* did not govern the disposal of revenues from mineral leases on wildlife refuges. 21 Comp. Gen. 873 (1942). See also Comp. Gen., B–105133, Oct. 10, 1951, App. 82.[10]

Third, our opinion in *Udall* v. *Tallman,* 380 U. S. 1 (1965), strongly suggests that the Mineral Leasing Act of 1920 governed the distribution of revenues from reserved refuge lands prior to 1964. That case. involved the authority of the Secretary to issue oil leases on the Kenai Moose Range after the lands had been withdrawn from the public domain by

---

[10] The Secretary speculates that Congress in 1964 probably assumed that oil and gas revenues from refuges on reserved lands were governed by the 1935 Refuge Act. The basis for this argument is language in the 1935 Refuge Act, continued today, that the Act governed the disposition of "shell, sand, or gravel, and from other privileges on refuges." See n. 4, *supra.* It sometimes was contended that "other privileges" included oil and gas leases. See Memorandum of July 6, 1951, Chief Counsel of the Fish and Wildlife Service, App. 87.

As noted, the Comptroller General·rejected this contention in 1942 and 1951. For the reasons elaborated in the text, we believe that it was understood by Congress that the 1935 Refuge Act did not govern the leasing of minerals. Indeed, even the 1946 opinion of the Solicitor of the Department of the Interior that the provision authorized oil leases on acquired refuge lands, App. 68, is contradicted by Congress' passage of the Mineral Leasing Act for Acquired Lands, Act of Aug. 7, 1947, ch. 513, 61 Stat. 913, 30 U. S. C. § 351 *et seq.,* which subsequently conferred this very authority on the Department. See also 40 Op. Atty. Gen. 9 (1941).

The dissent also speculates—inconsistently, we think—that Congress embraced this often discredited interpretation of the 1935 Refuge Act, *post,* at 279–280, n. 3. The dissent criticizes the Court for concluding that Congress' insertion of "minerals" in § 401 (a) did not change pre-existing law. *Post,* at 278–279. The dissent then explains that Congress added "minerals" in 1964 not to change the law, but to reaffirm that the 1935 Refuge Act already governed disposition of oil revenues from reserved refuge lands. *Post,* at 279–280, n. 3. In other words, the dissent contradicts itself and joins us in positing that the addition of "minerals" was never intended to work a substantive change, but disagrees merely about what the law provided prior to the 1964 amendments.

Executive Order. In holding that the Executive Order did not deprive the Secretary of this power, this Court held that the Mineral Leasing Act of 1920 conferred the necessary statutory authorization on the Secretary to grant the leases. "The Act excluded from its application certain designated lands, but did not exclude land within wildlife refuge areas." *Id.*, at 4 (footnote omitted).[11] Because § 35 of the Mineral Leasing Act prescribes the distribution formula for revenues received from all leases issued "under the provisions of this chapter," we think it an inescapable deduction from *Tallman* that, prior to 1964, the Act continued to provide the formula for disposition of revenues generated by leases on public lands after the lands were withdrawn for wildlife refuges.

Neither the Mineral Leasing Act of 1920 nor the 1935 Refuge Act authorized the Secretary to issue leases for mineral extraction from refuges created from acquired lands. 40 Op. Atty. Gen. 9 (1941) (Attorney General Jackson); 21 Comp. Gen. 873 (1942). Congress responded by passing the Mineral Leasing Act for Acquired Lands, Act of Aug. 7, 1947, ch. 513, 61 Stat. 913, 30 U. S. C. § 351 *et seq.* See n. 10, *supra.* In addition to conferring authority on the Secretary to issue leases for specified minerals, including oil and gas, it provided that revenues from the leases be "distributed in the same manner as prescribed for other receipts from the lands affected by the lease." 30 U. S. C. § 355.. As applied to wildlife refuges created from acquired lands, this provision requires that mineral revenues be distributed according to the formula in the 1935 Refuge Act.

---

[11] The Secretary argues that *Tallman's* construction of the Mineral Leasing Act should not now be binding, because the Court did not need to construe the Act. This is incorrect. The Court was required to determine that the Secretary had statutory authority to issue oil leases on refuges withdrawn from public lands, before it could reach the question whether the Executive Orders withdrawing the refuge lands limited that authority. The Court examined the language of § 1 of the Act and found that it gave the Secretary the requisite authority. See 380 U. S., at 4, n. 3.

Thus, when Congress amended the Wildlife Refuge Revenue Sharing Act in 1964, the disposition of oil and gas revenues was reasonably clear. Such revenues from reserved refuge lands were distributed according to the Mineral Leasing Act of 1920. Revenues from acquired refuge lands were distributed according to the formula in the 1935 Refuge Act, not by its own terms, but by operation of the 1947 Mineral Leasing Act for Acquired Lands.

## B

The question presented by these cases is whether Congress intended to alter this program of revenue distribution when it amended the 1935 Refuge Act in 1964. The impetus for proposals leading to the passage of the amendments was the difficulty the Department had experienced in acquiring new refuge lands. See 1964 S. Rep. 5; 1964 H. R. Rep. 2. Localities resisted having land removed from local tax roles. The purpose of the amendments was to "provide a more equitable formula for payments to counties as compensation for loss of taxable properties that have been acquired by the Federal wildlife refuge system." 1964 S. Rep. 2. See 1964 H. R. Rep. 2–3. Public Law 88–523 met this problem by changing the formula for distribution of revenues from refuges consisting of acquired lands. § 401 (c)(1), 78 Stat. 701. The new formula provided that counties within which acquired refuge lands lay could receive, at their option, a payment based on the adjusted cost of the lands rather than on revenues produced.[12] Congress intended the Department to pay more to counties under the new law than it had under the old.

There is no explanation in the legislative history of Pub. L. 88–523 for the insertion of "minerals" in the list of resources

---

[12] The 1964 payment formula was liberalized further in 1978. Pub. L. 95–469, § 1 (a)(3), 92 Stat. 1319. See n. 5, *supra* (quoting present law).

subject to the Wildlife Refuge Revenue Sharing Act. Such silence is suggestive, because Congress was concerned that the Department have sufficient funds to make the increased payments mandated by the amendments.[13]   See 1964 S. Rep. 12 (statement of Secretary Udall); 1964 H. R. Rep. 11. Congress might be expected to have mentioned a change wrought through the amendments which would increase refuge revenues by amounts exceeding total existing refuge revenues.[14]

During deliberations on the amendments, the Fish and Wildlife Service presented to Senate and House Committees tables showing present payments to counties containing refuges, and payments estimated under the proposed amendments.   1964 S. Rep. 13; 1964 H. R. Rep. 3.   The relevant table shows no change in the expected payments to the Borough of Kenai Peninsula.   This table assumed that oil and gas revenues were governed by the Mineral Leasing Act of 1920 both before and after the amendments.[15]

---

[13] The silence of Congress may provide a treacherous guide to its intent. *Scripps-Howard Radio, Inc.* v. *FCC*, 316 U. S. 4, 11 (1942).   Here, however, it is almost inconceivable that Congress knowingly would have changed substantially a longstanding formula for distribution of substantial funds without a word of comment.   In 1978, Congress inserted "salmonoid carcass[e]s" into the list of resources governed by § 401 (a) of the Wildlife Refuge Revenue Sharing Act.   Pub. L. 95–469, § 1 (a)(1), 92 Stat. 1319.   Even for this comparatively trivial addition, Congress explicitly stated, "[s]almonoid carcasses have been included to allow for the sale of salmon used in hatchery operations."   H. R. Rep. No. 95–1197, p. 8 (1978).

[14] In 1963, net receipts from the national wildlife system totaled $2,350,000.   1964 H. R. Rep. 11.   In 1964, revenues from oil and gas leases in the Kenai Moose Range exceeded $3,800,000.   App. to Brief for Federal Petitioners 2a.

[15] The table indicated that 1963 payments to the Kenai Peninsula Borough under the Wildlife Refuge Revenue Sharing Act, amended or unamended, totaled $1,768.   1964 H. R. Rep. 3.   This figure cannot include 25% of the revenues from oil and gas leases.   See n. 14, *supra.*

The inference seems inescapable that Congress in 1964 did not intend by the insertion of "minerals" in § 401 (a) of the Wildlife Refuge Revenue Sharing Act to subject revenues from oil leases on reserved refuge lands to its distribution formula. The more reasonable explanation for the intended effect of including "minerals" is provided by the Department of the Interior. The insertion of "minerals" appears first in 1962 in proposed bills supported by the Department as substitutes for other bills then pending before the House and Senate to increase payments to counties. S. 2138, 87th Cong., 1st Sess. (1961); H. R. 13176, 87th Cong., 2d Sess. (1962). In its report to the Committees, the Department offered no particular explanation for this new term, but the Secretary here concedes that this change was included within the proposal's descriptive category of "various perfecting . . . provisions." See Letter from Frank P. Briggs, Assistant Secretary of the Interior, June 20, 1962, in S. Rep. No. 1919, 87th Cong., 2d Sess., 13 (1962); H. R. Rep. No. 2499, 87th Cong., 2d Sess., 4 (1962).

The insertion of "minerals" in § 401 (a) could both leave the mineral revenues from reserved lands subject to the Mineral Leasing Act of 1920 and "perfect" § 401 (a) by incorporating prior changes. The 1947 Mineral Leasing Act for Acquired Lands subjected mineral revenues from lands acquired for wildlife refuges to the distribution formula in the 1935 Refuge Act. We hold that Congress inserted "minerals" in the amended § 401 (a) to recognize the effect of the 1947 Act and to make clear that the amended distribution formula applied to mineral revenues from acquired lands. This conclusion draws support from the evident fact that Congress was concerned almost exclusively with problems related to acquired refuge lands in adopting the 1964 amendments.

Finally, the Department of the Interior interpreted the amendments when passed, and for 10 years thereafter, as not altering the distribution formula. The Department's con-

temporaneous construction carries persuasive weight. *Udall* v. *Tallman,* 380 U. S., at 16. Such attention to contemporaneous construction is particularly appropriate in these cases, because the Department first proposed the amendment. See *SEC* v. *Sloan,* 436 U. S. 103, 120 (1978). The Department's current interpretation, being in conflict with its initial position, is entitled to considerably less deference. See *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 143 (1976). In these cases, we find it wholly unpersuasive.

## IV

In summary, we hold that revenues generated by oil and gas leases on federal wildlife refuges consisting of reserved public lands must be distributed according to the formula provided in § 35 of the Mineral Leasing Act of 1920. Finding no "clearly expressed congressional intention" to repeal this provision by implication, *Morton* v. *Mancari,* 417 U. S., at 551, we conclude that the term "minerals" in § 401 (a) of the Wildlife Refuge Revenue Sharing Act applies only to minerals on acquired refuge lands. Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE STEVENS, concurring.

My colleagues periodically criticize the way the Court manages its docket. Most frequently, such criticism takes the form of a dissent from the denial of certiorari. See, *e. g.,* *Brown Transport Corp.* v. *Atcon, Inc.,* 439 U. S. 1014 (WHITE, J., dissenting). Although I consider the practice of dissenting from denials of certiorari counterproductive, see *Singleton* v. *Commissioner,* 439 U. S. 940, 942–946 (opinion of STEVENS, J.), in the context of the present cases it may be appropriate to suggest that the Court may misuse its scarce resources not only by occasionally denying certiorari in cases deserving plenary consideration, but also by granting certio-

rari without adequate justification.[1]   As long as the Court creates unnecessary work for itself in this manner, its expressions of concern about the overburdened federal judiciary will ring with a hollow echo.

In these cases, the Court of Appeals for the Ninth Circuit should have been permitted to provide the final answer to the unique question of statutory construction presented by the petitions for certiorari.   The decision of the Court of Appeals did not conflict with any other judicial decision, and there is no reason to anticipate that a comparable issue will arise in another Circuit in the foreseeable future.[2]   I fully agree with the majority's explanation of why the Court of Appeals correctly read these ambiguous statutes, but even if I were persuaded that JUSTICE STEWART had the better of the argument, I still would feel that the public interest would have been better served by allowing this litigation to terminate in the Court of Appeals.

The question of how to divide the revenues from oil and gas leases on public lands in the Kenai Peninsula is clearly a matter for Congress to decide.   If Congress is displeased with the decisions of this Court and the Court of Appeals, it may promptly reverse them by revising the relevant statutes. If that is its view, it no doubt would have acted more promptly if we had simply denied certiorari.[3]   On the other

---

[1] Of course, these two problems are not wholly independent of one another.   In light of the ever-increasing number of petitions for certiorari and the severe practical constraints on our ability freely to grant certiorari, it is certainly safe to assume that whenever we grant certiorari in a case not deserving plenary review, we increase the likelihood that certiorari will be denied in other, more deserving, cases.

[2] Neither of the petitions for certiorari filed in these cases suggested that the Court of Appeals' decision conflicted with any other judicial decision. In addition, the Solicitor General, in the petition filed on behalf of the federal parties, observed that the question of statutory construction presented here was unlikely to arise in the foreseeable future in another Circuit.   See Pet. for Cert. in No. 79–1890, p. 18.

[3] In fact, Congress declined to clarify its intention with respect to the

hand, if we have correctly perceived the intent of the legislature, nothing has been gained by protracting this litigation. Admittedly, a significant amount of money was at stake, see *ante*, at 263, n. 6, but the offsetting costs associated with holding the funds in escrow pending our review, as well as the costs associated with the expenditure of this Court's material and human resources, are also significant.

The federal judicial system is undergoing profound changes. Among the most significant is the increase in the importance of our courts of appeals. Today they are in truth the courts of last resort for almost all federal litigation. Like other courts of last resort—including this one—they occasionally render decisions that will not withstand the test of time. No judicial system is perfect and no appellate structure can entirely eliminate judicial error. Most certainly, this Court does not sit primarily to correct what we perceive to be mistakes committed by other tribunals. Although our work is often accorded special respect because of its finality,[4] we possess no judicial monopoly on either finality or respect. The quality of the work done by the courts of appeals merits the esteem of the entire Nation, but, unfortunately, is not nearly as well or as widely recognized as it should be. Indeed, I believe that if we accorded those dedicated appellate judges the deference that their work merits, we would be better able to resist the temptation to grant certiorari for no reason other than a tentative prediction that our review of a case may produce an answer different from theirs. In my opinion, that is not a sufficient reason for granting certiorari.[5]

---

distribution of the Kenai oil and gas leasing revenues in part because of the concerns of some of its Members that such legislative action would be inappropriate while these cases were still pending in the federal courts. See *ante*, at 264–265, n. 8; *post*, at 285, n. 10.

[4] Indeed, as Justice Jackson once noted, "[w]e are not final because we are infallible, but we are infallible only because we are final." *Brown* v. *Allen*, 344 U. S. 443, 540 (concurring in result).

[5] The possibility that a lower court may have incorrectly decided a federal question is, of course, a relevant factor when this Court decides

Because no other reason for reviewing this case is apparent, a simple denial of certiorari would have been an appropriate and efficient disposition.

My disagreement in these cases with the Court's management of its docket does not, of course, prevent me from joining JUSTICE POWELL's opinion for the Court on the merits.

JUSTICE STEWART, with whom THE CHIEF JUSTICE and JUSTICE MARSHALL join, dissenting.

Today the Court strains to conclude that Congress did not mean what it said, and judicially repeals a reasonable [1]

whether to exercise its discretionary certiorari jurisdiction. However, as Rule 17.1 of the Rules of this Court makes plain, our certiorari jurisdiction is designed to serve purposes broader than the correction of error in particular cases:

"A review on writ of certiorari is not a matter of right, but of judicial discretion, and will be granted only when there are special and important reasons therefor. The following, while neither controlling nor fully measuring the Court's discretion, indicate the character of reasons that will be considered.

"(a) When a federal court of appeals has rendered a decision in conflict with the decision of another federal court of appeals on the same matter; or has decided a federal question in a way in conflict with a state court of last resort; or has so far departed from the accepted and usual course of judicial proceedings, or so far sanctioned such a departure by a lower court, as to call for an exercise of this Court's power of supervision.

"(b) When a state court of last resort has decided a federal question in a way in conflict with the decision of another state court of last resort or of a federal court of appeals.

"(c) When a state court or a federal court of appeals has decided an important question of federal law which has not been, but should be, settled by this Court, or has decided a federal question in a way in conflict with applicable decisions of this Court."

By its own terms, Rule 17.1 "neither control[s] nor fully measur[es]" the extent of our discretion to grant or to deny certiorari. Nonetheless, it is surely significant that none of the factors identified in the Rule can fairly be said to be present in these cases.

[1] There is nothing unreasonable, or even unusual, about a system of revenue sharing that returns a portion to the locality most immediately

and specific legislative provision because the provision announced a change in the law the Court divines to have been unintended.

## A

The Wildlife Refuge Revenue Sharing Act, as amended in 1964, expressly provides that "all revenues received by the Secretary of the Interior from the sale or other disposition of . . . minerals . . ." within federal wildlife refuges administered by the Fish and Wildlife Service shall be "reserved in a separate fund for disposition as hereafter prescribed." 16 U. S. C. § 715s (a) (1976 ed., Supp. III). At the end of each fiscal year, a portion of these revenues is to be distributed to the counties in which the refuges are located. In the case of "any reserve area," expressly defined as "land withdrawn from the public domain" for wildlife refuge purposes, § 715s (g)(3), the allocation to the county is 25% of net receipts. § 715s (c)(2). Alternative formulas are specified for refuges created out of "fee areas." § 715s (c)(1). Net receipts remaining after the payments to counties "shall be transferred to the Migratory Bird Conservation Fund for use in the acquisition of suitable areas for migratory bird refuges." § 715s (e). The statute draws no distinction between mineral revenues and receipts from other natural resources or between revenues from "acquired" lands and those from "reserved" lands. The statutory scheme is therefore clear: receipts from mineral leases, like all other revenues generated from wildlife refuges, whether the refuge is comprised of reserved or acquired lands, are to be apportioned between the

affected rather than to the State at large. The payment of 25% of the revenues to the county in which the refuge is situated compensates the county for tax revenue lost because of the public status of the lands and for any local services made necessary because of the refuge, and the payment of 75% to the special fund provided for in 16 U. S. C. § 715s (1976 ed., Supp. III) satisfies the need to provide a source of revenue for refuge management and maintenance.

counties and the federal Migratory Bird Conservation Fund. No receipts are to go to the State itself.

The Court argues that the addition of the word "minerals" to the Wildlife Refuge Revenue Sharing Act must be read to apply only to acquired refuge lands and not to reserved refuge lands. But there is no support, in law or legislative history, for exempting mineral revenues from refuges consisting of reserved public lands from the distribution formula of the Wildlife Refuge Revenue Sharing Act. The District Court concluded that "there is nothing in 16 U. S. C. § 715s which would support a restrictive construction of the word 'minerals,'" and that "a literal approach of statutory construction would dictate an expansive definition including both reserved and acquired lands." 436 F. Supp. 288, 291. Similarly, the Court of Appeals found that "under the plain meaning of minerals and of the other provisions of § 715s, its language fairly brings the Kenai Moose Range oil and gas revenues within it scope." 612 F. 2d 1210, 1213. It was a mistake for either court to proceed further.

The addition of the word "minerals" to the Wildlife Refuge Revenue Sharing Act in 1964 would be meaningless if it reached only leases of acquired lands. And, "[i]n construing a statute we are obliged to give effect, if possible, to every word Congress used." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 339. Section 6 of the Mineral Leasing Act for Acquired Lands, 30 U. S. C. § 355, already provided that mineral leases of acquired lands "shall be distributed in the same manner as prescribed for other receipts from the lands affected by the lease." Accordingly, any allocation scheme established for wildlife refuges encompassing acquired lands would automatically apply to mineral revenues, as well as those from the resources specified in the Refuge Act. As there was no ambiguity on that point, there was no useful purpose for Congress to declare once again how mineral revenues from acquired lands within wildlife refuges would be allocated.[2]

---

[2] But see n. 3, *infra*.

The suggestion, therefore, that the 1964 amendment reached only acquired lands presumes that the design of Congress in adding the word minerals was to accomplish precisely nothing.

## B

The Court concludes that the statute does not mean what it says because the Wildlife Refuge Revenue Sharing Act of 1964 is in conflict with the Mineral Leasing Act of 1920,[3]

---

[3] While it is clear there is a conflict, it is not at all clear that the conflict is even relevant to these cases. The Court assumes that the 1964 amendment, if given its plain meaning, changed the allocation of oil and gas lease revenues to affected counties. Although, as the Court of Appeals correctly noted, "the legislative history of the 1964 amendments to 16 U. S. C. § 715s sheds no direct light on the issue here," 612 F. 2d 1210, 1213, it is arguable that before 1964, oil and gas lease receipts generated from lands in federal wildlife refuges were subject to § 401 of the Wildlife Refuge Act of 1935, ch. 261, 49 Stat. 383, and *not* to the Mineral Leasing Act of 1920, despite the vigorous contentions of today's Court. See *ante,* at 267–268.

Section 401 of the 1935 Act established a distribution scheme for refuge revenues "from the sale or other disposition" of natural resources and receipts "from other privileges." Although oil and gas leases are not mentioned, the provision was intended to give the administering agency broad authority to make "disposition of surplus . . . products on these reservations or refuges upon such terms and conditions as [it] shall determine to be for the best interests of the Government." H. R. Rep. No. 886, 74th Cong., 1st Sess., 3 (1934). In 1946, the Interior Department ruled that oil and gas leases could be granted on wildlife refuge lands under the 1935 Act. Op. Solic. Interior Dept. M. 34516 (Aug. 5, 1946). Under the 1964 amendments to the Wildlife Refuge Revenue Sharing Act, 25% of oil and gas lease revenues are apportioned to the affected counties embracing reserved refuge lands. Accordingly, Congress may have intended that the addition of the word "minerals" in 16 U. S. C. § 715s (1976 ed., Supp. III) was merely a "perfecting provision," S. Rep. No. 1919, 87th Cong., 2d Sess., 2 (1962); H. R. Rep. No. 2499, 87th Cong., 2d Sess., 4 (1962), and not an amendment of existing law at all.

Indeed, Interior Department spokesmen in the 1962, 1963, and 1964 congressional hearings described the existing law for receipts collected from both reserved public lands and acquired lands as generally subject to § 401 of the 1935 Act. See S. Rep. No. 1919, *supra,* at 2, 13;

and because "repeals by implication are not favored." *Ante*, at 267. But that canon of construction has no force in this context. The challenged section in the 1964 Act, far from "repealing" the 1920 Act, merely established a limited and specific exception to one of the provisions in the earlier law. When the text of a new statute, dealing with a discrete subject, is unambiguous, it should be given effect even if it alters a previous law that dealt with the same general subject.

The maxim that "repeals by implication are disfavored" has force when the argument is made that a general statute, wholly occupying a field, eviscerates an earlier and more specific enactment of limited coverage but without an indication of congressional intent to do so. In such a case, it may be reasonable to presume that Congress had not antici-

H. R. Rep. No. 2499, *supra*, at 4; H. R. Rep. No. 1753, 88th Cong., 2d Sess., 14 (1964); S. Rep. No. 1096, 88th Cong., 2d Sess., 25 (1964). The Secretary of the Interior stated that "[*u*]*nder existing law, enacted in 1935*, the counties in which our refuges are located receive 25 percent of the net revenue from operations on national wildlife refuges, such as *oil production*, grazing, timber harvest, and the like." More Equitable Payments To Counties Having Wildlife Refuges: Hearings on S. 179, S. 1363, S. 1720, and S. 2498 before the Senate Committee on Commerce, 88th Cong., 2d Sess., 19 (1964) (emphasis added); Participation By Counties In Refuge Receipts: Hearings on H. R. 1127, H. R. 2393, H. R. 5596, H. R. 9030 and H. R. 11008 before the Subcommittee on Fisheries and Wildlife Conservation of the House Committee on Merchant Marine and Fisheries, 88th Cong., 2d Sess., 34 (1964) (emphasis added).

But it is not important to decide today what the true rule for apportionment of mineral resources from refuge lands was before 1964. And, contrary to the Court's assertion, I do not do so here, and "explai[n] that Congress added 'minerals' . . . to reaffirm" that the 1935 Act already controlled the disposition of oil revenues from reserved refuge lands. *Ante*, at 268, n. 10. In 1964, Congress did not have to resolve the question of what the law had been before; its concern was properly with the future. Ideally, it could have prefaced § 715s with the language "notwithstanding any other provision of law." But it did not. Instead, it introduced an entirely unambiguous prospective rule with the phrase: "Beginning with the next full fiscal year and for each fiscal year thereafter . . . ." At least for me, it needed to do no more.

pated that its broad pronouncement would have serious implications in a peripheral, or even quite different, area, and that had it recognized that a specific earlier law would be rendered meaningless by a new enactment, it would have expressly indicated its intent to repeal or amend.

Thus, in *Morton* v. *Mancari*, 417 U. S. 535, the Court refused to find a repeal where the words of the Equal Employment Opportunity Act of 1972, if taken literally, would have worked a repeal of an Indian preference policy consistently recognized by Congress for almost 40 years. The Court's description of *Mancari* as "a prototypical case where an adjudication of repeal by implication is not appropriate," *id.*, at 550, is instructive: "The preference is a longstanding, important component of the Government's Indian program. The anti-discrimination provision, aimed at alleviating minority discrimination in employment, obviously is designed to deal with an entirely different and, indeed, opposite problem." *Ibid.;* see also *Fussell* v. *Gregg*, 113 U. S. 550. The contrast with these cases is obvious. The provision in the more recent enactment deals specifically with the *same* subject—distribution of revenue from leases on federal lands—that had been the object of an earlier, and more general,[4] statute.[5] In any case, there is more than enough evidence

---

[4] While the Mineral Leasing Act of 1920 covers in general terms the distribution of revenue from federal lands, the later Wildlife Refuge Revenue Sharing Act, as amended in 1964, embraced new provisions that apply with particularity to wildlife refuges, without distinction between those reserved or acquired. To that extent, the later Act must constitute a repeal of the former. "[T]he narrowly drawn, specific . . . provision . . . must prevail over the broader . . . provision . . . ." *Radzanower* v. *Touche Ross & Co.*, 426 U. S. 148, 158.

[5] These cases do not involve an apparent limitation on an important and pervasive statute, such as the Sherman Act. See, *e. g., United States* v. *Borden Co.*, 308 U. S. 188. In such a case, as in *Mancari*, implied repeals are not found because it would be unreasonable to assume Congress would alter fundamental policy without an unambiguous expression of its intent to do so. But it is equally unreasonable to expect

to indicate that Congress was aware of what it was doing when the word "minerals" was added to the Wildlife Refuge Revenue Sharing Act.

The legislative history of the 1964 amendments to 16 U. S. C. § 715s (1976 ed., Supp. III) discloses that Congress had before it numerous bills from which to choose to compensate counties in which wildlife refuges were located, some of which omitted any reference to "minerals," S. 2138, 87th Cong., 1st Sess. (1961); S. 2678, 2770, 2927, 3201, 87th Cong., 2d Sess. (1962); H. R. 12144, 12143, 11535, 11525, 10714, 87th Cong., 2d Sess. (1962); S. 1720, 88th Cong., 1st Sess. (1963); and some that included such reference, H. R. 2393, 1004, 1127, 9030, 5996, 88th Cong., 1st Sess. (1963); H. R. 11008, 88th Cong., 2d Sess. (1964); S. 179, 1363, 88th Cong., 1st Sess. (1963); S. 2498, 88th Cong., 2d Sess. (1964). Presumably when Congress adopted a bill containing the term, it was aware of the difference. Moreover, the 1964 amendment was not a "technical" amendment, nor was it a last-minute addition from the floor. See *United States* v. *Batchelder*, 442 U. S. 114, 120. The suggestion that the word "minerals" be added to 16 U. S. C. § 715s (1976 ed., Supp. III) was raised in June 1962 when the Interior Department submitted a substitute bill for those pending in the House and Senate. Report of the Department of the Interior dated June 20, 1962, in S. Rep. No. 1919, 87th Cong., 2d Sess., 13, 15 (1962); Report of the Department of the Interior of June 22, 1962, in Authorize Increased Payments to Counties for Wildlife Refuges: Hearings on H. R. 10714, H. R. 11525, H. R. 11535, H. R. 12143, and H. R. 12144 before the Subcommittee on Fisheries and Wildlife Conservation of the House Committee on Merchant Marine and Fisheries, 87th Cong., 2d Sess., 7, 9 (1962).

---

Congress to specify, or indeed even to consider, the effect of a new statutory provision on all earlier provisions affecting the same subject that may be swept away by the enactment, particularly if the old provisions are unclear. See n. 3, *supra.*

The amendment was not highlighted, but it is unlikely that it escaped notice.[6] Later the same year, the relevant Committees of both the House and the Senate adopted the language, S. Rep. No. 1919, *supra,* at 19; H. R. Rep. No. 2499, 87th Cong., 2d Sess., 9 (1962), and the text was before Congress for the following two years.

It is therefore very difficult to conclude that the addition was inadvertent or unnoticed.[7] But, in any case, nothing in the legislative history demonstrates congressional intent different from that reflected in the words of the statute. " 'The most that can be said for the legislative history is that it is on the whole inconclusive. Certainly, it contains nothing that requires the court to reject the construction which the statu-

---

[6] The Court makes much of the fact that a statistical table comparing revenues actually received by counties with those estimated to result from the amendment showed no change in the amounts from the Kenai Range, and if the amendment meant what a plain reading of it indicates, an increase should have been reflected. *Ante,* at 271. That straw of evidence scarcely compels the conclusion that the amendment does not mean what it says. It would hardly be surprising if the legislators overlooked a single disparity in a single entry in a lengthy exhibit. And it is noteworthy that the table the Court refers to appeared in the 1964 Reports only, while the addition of the word "minerals" to § 715s was proposed in 1962, when the comparable statistical table did not include any indication of the anticipated payments to counties from public land areas under the proposed amendment. See S. Rep. No. 1919, 87th Cong., 2d Sess., 11, nn. 1 and 2 (1962).

[7] That Congress explained the addition of "[s]almonoid carcasses," see *ante,* at 271, n. 13, hardly supports the inference that Congress would also have explained the addition of the word "minerals." By the Court's strained logic, premised on the notion that "[t]he silence of Congress may provide a treacherous guide to its intent," *ibid.,* Congress is put on notice that any time it explains one provision of a statute, no matter how trivial, it does so at its peril. For if it fails similarly to explain all provisions, no matter how important, a court would be free to strike those unexplained provisions as unintended. That, in my view, leads to far more "treacherous" results than those feared by today's Court.

tory language clearly requires.'" *Ullman* v. *United States,* 350 U. S. 422, 433.

The Court today is bothered because the literal meaning of a statute altered prevailing law.[8] But usually the very point of new legislation is to alter prevailing law. "Every act is made, either for the purpose of making a change in the law, or for the purpose of better declaring the law; and its operation is not to be impeded by the mere fact that it is inconsistent with some previous enactment." T. Sedgwick, The Interpretation and Construction of Statutory and Constitutional Law 104 (2d ed. 1874). Congress does not have the affirmative obligation to explain to this Court why it deems a particular enactment wise or necessary, or to demonstrate that it is aware of the consequences of its action.[9] See *Harrison* v. *PPG Industries, Inc.,* 446 U. S. 578, 592. And "[i]t

---

[8] This is not a case where the plain meaning of statutory language would lead to an absurd or futile result, see, e. g., *Armstrong Paint & Varnish Works* v. *Nu-Enamel Corp.,* 305 U. S. 315, or to an unreasonable result at variance with the policy of the legislation as a whole. See, e. g., *United States* v. *American Trucking Assns., Inc.,* 310 U. S. 534. See also *Shapiro* v. *United States,* 335 U. S. 1, 31.

[9] The Court relies on the fact that the Department of the Interior ignored the 1964 amendment for a decade with respect to oil and gas revenues from the Kenai Range. *Ante,* at 272–273. But administrative errors are not self-validating. See *SEC* v. *Sloan,* 436 U. S. 103, 117–119; *Adamo Wrecking Co.* v. *United States,* 434 U. S. 275, 287–288, n. 5; *Dixon* v. *United States,* 381 U. S. 68, 78. Unauthorized payments from the federal Treasury are not immune from correction, and the United States can retrieve money mistakenly dispersed by its officials. *United States* v. *Wurts,* 303 U. S. 414, 415–416; *Wisconsin Central R. Co.* v. *United States,* 164 U. S. 190, 212. In any case, there is no indication that the administrative practice until 1975 was the result of considered evaluation of the 1964 amendments. Instead it appears that it was the inertial continuation of earlier practice. A much more reliable indication of the administrative construction of the 1964 amendment is the "detailed and comprehensive" re-evaluation by the Department in 1975, confirmed by the Comptroller General. *Andrus* v. *Sierra Club,* 442 U. S. 347, 358. See also *NLRB* v. *Iron Workers,* 434 U. S. 335, 351.

is not a function of this Court to presume that 'Congress was unaware of what it accomplished.'" *Albernaz* v. *United States,* 450 U. S. 333, 342 (quoting *U. S. Railroad Retirement Board* v. *Fritz,* 449 U. S. 166, 179).

Rather than join the Court in its speculative efforts to deal with the doctrine of implied repeal, I would rest decision of these cases upon an established rule of statutory construction: *leges posteriores, priores contrarias abrogant.* Sedgwick describes this rule with approval as follows: " 'If two inconsistent acts be passed at different times, the last,' said the Master of the Rolls, 'is to be obeyed; and if obedience cannot be observed without derogating from the first, it is the first which must give way.'" Sedgwick, *supra,* at 104. See *District of Columbia* v. *Hutton,* 143 U. S. 18, 26–27; *Henderson's Tobacco,* 11 Wall. 652, 657; *United States* v. *Tynen,* 11 Wall. 88, 92. Observance of this rule also allows the Court to respect the most basic of all canons of statutory construction: that statutes mean what they plainly say.[10] As Chief Justice Marshall said more than a century and a half ago: "[T]he intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words there is no room for construction. The case must

---

[10] Of course, if I am wrong, and Congress did not intend that oil revenues from reserved refuge lands be distributed according to the scheme of the 1964 Act, Congress is always free to revise the statute. It would be far more appropriate, given the constitutional allocation of lawmaking power to Congress and not to the courts, if this Court were to respect the plain meaning of the statute, and leave it to Congress to make any changes it thinks necessary. The Court's readiness to rewrite legislation contributes, I am afraid, to undue congressional willingness to leave it to the courts to do its redrafting. Indeed, the Senate Committee on Environment and Public Works, when confronted with the dispute involved in these cases chose to "tak[e] no position as to whether disposition of mineral revenues should be made pursuant to the Mineral Leasing Act or the Refuge Revenue Sharing Act." S. Rep. No. 95–1174, pp. 4, 8 (1978). See also *ante,* at 264–265, n. 8.

be a strong one indeed, which would justify a court in departing from the plain meaning of words . . . in search of an intention which the words themselves did not suggest." *United States* v. *Wiltberger,* 5 Wheat. 76, 95–96.