871 F.2d 149
 29 ERC 1385, 276 U.S.App.D.C. 352, 57
USLW 2643,
19 Envtl. L. Rep. 20,847
 MOBIL OIL CORPORATION, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Hazardous Waste Treatment Council, Chemical Waste
Management, Inc., Chemical Manufacturers
Association and American Iron & Steel
Institute, Intervenors.
 No. 88-1788.
 United States Court of Appeals,
District of Columbia Circuit.
 April 4, 1989.
 
 Karl S. Bourdeau and Harold Himmelman, Washington, D.C., were on the brief, for petitioner.
 Daniel S. Goodman, Atty. Dept. of Justice, Donald A. Carr, Acting Asst. Atty. Gen., Dept. of Justice, and Steven E. Silverman, Atty., U.S.E.P.A., Washington, D.C., were on the brief, for respondent.
 Roger J. Marzulla, Atty. Dept. of Justice, and Lawrence J. Jensen, Atty., U.S.E.P.A., Washington, D.C., also entered appearances for respondent.
 David R. Case and Angus Macbeth, Washington, D.C., were on the joint brief, for intervenors Hazardous Waste Treatment Council and Chemical Waste Management, Inc.
 John T. Smith II and David F. Zoll, Washington, D.C., were on the brief, for intervenor Chemical Mfr's Ass'n.
 Steven F. Hirsch, Gary H. Baise and Barton C. Green, Washington, D.C., entered appearances, for intervenor American Iron & Steel Institute.
 Before WALD, Chief Judge, and EDWARDS and RUTH BADER GINSBURG, Circuit Judges.
 Opinion Per Curiam.
 
 PER CURIAM:
 
 1
 Petitioner Mobil Oil Corporation ("Mobil") challenges the Environmental Protection Agency's ("EPA") new interpretation of Sec. 3004(h)(4) of the Resource Conservation and Recovery Act ("RCRA" or "the Act"), 42 U.S.C. Sec. 6924(h)(4). We conclude that the EPA's interpretation of this statutory provision represents a reasonable exercise of the agency's discretion. The petition for review is accordingly denied.[1]
 
 I. FACTS
 
 2
 Pursuant to its statutory mandate, the EPA recently established land disposal restrictions for a number of hazardous wastes. See 53 Fed.Reg. 31,137 (August 17, 1988).[2] These wastes are prohibited from land disposal unless they have been treated so as to meet standards set by the regulations. In some cases, however, the agency recognized that, due to a lack of available treatment facilities, it is not feasible to require immediately that particular wastes be treated to the applicable standard. For these wastes, the EPA established a two-year "national capacity variance."[3] The statute provides that national capacity variance wastes "may be disposed of in a landfill or surface impoundment only if such facility is in compliance with the requirements of subsection (o ) of this section." RCRA Sec. 3004(h)(4), 42 U.S.C. Sec. 6924(h)(4). Subsection (o ), 42 U.S.C. Sec. 6924(o ), imposes certain "[m]inimum technological requirements": double liners, a leachate[4] collection system, and groundwater monitoring.
 
 
 3
 The dispute between the parties here centers on the statutory requirement that national capacity variance wastes be disposed in a "facility" which meets the technological requirements established by subsection (o ). These technological standards apply (for purposes relevant here) only to landfills or surface impoundments placed in operation after November 8, 1984. Subsection (o ) does not prohibit the land disposal of hazardous waste in older units which do not meet the technological requirements. Under the EPA's original interpretation of Sec. 3004(h)(4), national capacity variance wastes could be land disposed in these other units, so long as any new units at the same waste management complex met the Sec. 3004(o ) standards, since the "facility" (meaning the management complex as a whole) would satisfy the Sec. 3004(o ) requirements. See 51 Fed.Reg. 40,603-40,604 (November 7, 1986).
 
 
 4
 The August 1988 rulemaking, however, announced that
 
 
 5
 EPA has reevaluated its original interpretation and now believes that Congress intended the term "facility" to refer to "unit," which is consistent with the Agency's current interpretation of the term "facility" in RCRA section 3004(g)(6), referring to the disposal of First Third wastes for which no treatment standards have been established.
 
 
 6
 53 Fed.Reg. 31,186 (August 17, 1988). Under this new interpretation, land disposal of national capacity variance wastes is permitted only if the individual landfill or surface impoundment satisfies the 3004(o ) requirements of double lining, leachate collection, and groundwater monitoring. Mobil contends that this is an impermissible construction of the statutory language.
 
 II. ANALYSIS
 A. Scope of Review
 
 7
 Our analysis is guided by the Supreme Court's decision in Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 8
 If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 9
 467 U.S. at 842-43, 104 S.Ct. at 2781-82 (citations omitted). In the present case, we do not believe that the statutory language is unambiguous. The RCRA does not provide a definition of the term "facility." Nor does the legislative history offer a clear and unequivocal resolution of this question. We therefore must determine whether the agency has arrived at a "permissible"-- i.e., reasonable--interpretation of the Act.
 
 
 10
 Mobil relies heavily on the Supreme Court's recent pronouncement that "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." INS v. Cardoza-Fonseca, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) (citing Watt v. Alaska, 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)). Of course, since Chevron itself involved an agency shift in policy, that case could hardly be inapposite simply because the EPA has reconsidered its earlier views. Although the consistency of an agency's interpretation is one relevant factor in judging its reasonableness, see NLRB v. United Food & Commercial Workers Union, 484 U.S. 112, 108 S.Ct. 413, 421 n. 20, 98 L.Ed.2d 429 (1987), an agency's reinterpretation of statutory language is nevertheless entitled to deference, so long as the agency acknowledges and explains the departure from its prior views.[5]
 
 B. The Statutory Language
 
 11
 The word "facility" is not defined by the statute and appears to be a generic term rather than a term of art. Given the EPA's superior competence in technical matters, the agency should have broad discretion to give content to this language. See MCI Cellular Telephone Company v. FCC, 738 F.2d 1322, 1333 (D.C.Cir.1984) (on "a highly technical question ... courts necessarily must show considerable deference to an agency's expertise"). The EPA's construction of the statutory term is reinforced by the context in which that term appears. The provision at issue here states that national capacity variance wastes "may be disposed of in a landfill or surface impoundment only if such facility is in compliance with the requirements of subsection (o )." RCRA Sec. 3004(h)(4), 42 U.S.C. Sec. 6924(h)(4) (emphasis supplied). The phrase "such facility" appears to refer back to "landfill or surface impoundment." This supports the agency's conclusion that the "facility" involved is the individual unit rather than the waste management complex as a whole.
 
 
 12
 The petitioner emphasizes that the agency, in construing other portions of the statute, has not always read the word "facility" to refer to the individual unit. The EPA acknowledges this fact but argues that
 
 
 13
 [t]he statutory definitions in which the word is used suggest that "facility" is a convenient general term to describe any place in which wastes are managed.... Congress thus did not ascribe one fixed definition to the term, intending instead that its precise meaning depend upon the context in which it is used.
 
 
 14
 Brief for EPA at 22. We believe that the agency's position is amply justified both by logic and by precedent. Congress has given no indication that a uniform interpretation of this term was somehow integral to the statutory scheme. If the expert agency believes that the legislative purposes will best be satisfied by construing the term to mean different things in different contexts, then it may act upon that premise. This court has previously upheld the agency's decision to employ different definitions of the term "facility" in construing different portions of the RCRA. See United Technologies Corporation v. U.S. Environmental Protection Agency, 821 F.2d 714, 721-23 (D.C.Cir.1987).
 
 
 15
 Moreover, this is not the only time that the agency, in interpreting the RCRA, has read the word "facility" to refer to individual units. The EPA has adopted this reading in its implementation of Sec. 3004(g)(6), the statutory provision dealing with "soft hammer" wastes.[6] See 53 Fed.Reg. 31,186 (August 17, 1988). Mobil appears to concede that this is a permissible interpretation of Sec. 3004(g)(6). See Brief for Petitioner at 25-26. Thus, to accept petitioner's interpretation of Sec. 3004(h)(4) would not eliminate the "problem"--differing interpretations of the word "facility" in different parts of the statute--to which Mobil has directed our attention.
 
 C. Policy Concerns
 
 16
 The EPA's new interpretation of Sec. 3004(h)(4) also appears consonant with the policies underlying Congress' decision to grant national capacity variances in certain limited circumstances. Whenever a national capacity variance is granted, the agency is by definition allowing the land disposal of waste in a manner that does not comply with applicable standards. Congress was plainly concerned, however, that even during variance periods hazardous wastes should be disposed of in a safe and responsible manner. Certainly it was reasonable for the agency to construe the variance provisions narrowly so that the statutory scheme is not undermined. The statute in essence reflects the view that if adherence to the treatment standards is not feasible, then companies should be required to do the next best thing. The next best thing in this context is disposal in a unit that complies with the Sec. 3004(o ) requirements, not simply disposal in a noncomplying old unit in a treatment complex whose new units meet the requirements.
 
 D. Legislative History
 
 17
 Although the legislative history is not in itself determinative of the question, it does lend further support to the EPA's construction of the statutory language. The Conference Report to the 1984 amendments discussed the treatment requirements which would apply when a case-by-case capacity variance was granted under Sec. 3004(h)(3). The Report stated that "[f]or the duration of any such extension, use of landfills or surface impoundments for such wastes is restricted to those that meet the minimum technological requirements of the bill for new facilities." H.R.Conf.Rep. No. 1133, 98th Cong., 2d Sess. 87 (1984), U.S.Code Cong. & Admin.News 1984, pp. 5576, 5658 (emphasis supplied). The italicized language plainly suggests that disposal in an old, unlined unit would not meet the statutory requirements for land disposal during a case-by-case extension. Since Sec. 3004(h)(4) governs the land disposal of hazardous wastes during case-by-case extensions and national capacity variance periods, the same result should obtain in the present case.
 
 
 18
 Congressman Florio, a sponsor of the 1984 amendments, spoke to the same effect when he discussed the disposal restrictions applicable to soft-hammer and national capacity variance wastes. The Congressman stated that "[i]f EPA fails to meet either of its first two deadlines and if there is no treatment capacity, then the wastes that have not been reviewed would have to be sent to land disposal facilities that are double-lined and have leachate collection systems." 130 Cong.Rec. H11,142 (daily ed. October 3, 1984).[7] The reference to "facilities that are double-lined" indicates that the "facilities" at issue are individual units--not the larger disposal complexes.
 
 III. CONCLUSION
 
 19
 Though the challenged regulatory approach represents a change in agency policy, the EPA has acknowledged that change and has cogently explained the reasons for it. We believe that the agency's new interpretation is entirely reasonable in light of the statutory language, the policies underlying the Act, and the legislative history. The petition for review is accordingly
 
 
 20
 Denied.
 
 
 
 [1]
 Our holding is consistent with a prior panel's decision in Steel Bar Mills Association v. EPA, No. 88-1608 (judgment order filed February 22, 1989). However, since Steel Bar Mills was decided in an unpublished order, and since Mobil was not a party to that dispute, we are not bound by the earlier decision. See National Classification Committee v. United States, 765 F.2d 164, 170 (D.C.Cir.1985) (under this circuit's rules, an unpublished opinion is binding upon the parties if the issue is relitigated, but "has no precedential effect with respect to other parties")
 
 
 [2]
 The RCRA was enacted in 1976 and substantially amended in 1984. The Hazardous Solid Waste Amendments of 1984 required the EPA to establish a schedule dividing hazardous wastes into "thirds," see 42 U.S.C. Sec. 6924(g)(4); the agency promulgated the schedule in May of 1986. See 51 Fed.Reg. 19,300 (May 28, 1986). The August 1988 rulemaking established treatment standards for "first-third" scheduled wastes. For a fuller discussion, see generally Chemical Waste Management v. EPA, 869 F.2d 1526, 1529-30 slip op. at 7-8 (D.C.Cir.1989)
 
 
 [3]
 The agency's authority to establish a national capacity variance is derived from RCRA Sec. 3004(h)(2), 42 U.S.C. Sec. 6924(h)(2), which provides that "[t]he Administrator may establish an effective date different from the effective date which would otherwise apply.... Any such other effective date shall be established on the basis of the earliest date on which adequate alternative treatment, recovery, or disposal capacity which protects human health and the environment will be available. Any such other effective date shall in no event be later than 2 years after the effective date of the prohibition which would otherwise apply...."
 
 
 [4]
 Leachate is produced when liquids, such as rainwater, percolate through wastes stored in a landfill or surface impoundment. If the wastes are stored in lined containers, the leachate can be removed and treated before it seeps into soil or groundwater
 
 
 [5]
 Cf. Greater Boston Television Corporation v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored....") (citations omitted)
 
 
 [6]
 "Soft-hammer" wastes are wastes for which the EPA has failed to set treatment standards by the date prescribed by statute. These wastes may be disposed in a landfill or surface impoundment only if "such facility is in compliance with the requirements of subsection (o ) of this section which are applicable to new facilities (relating to minimum technological requirements)." RCRA Sec. 3004(g)(6), 42 U.S.C. Sec. 6924(g)(6). See Chemical Waste Management, supra, 869 F.2d at 1530 n. 3
 
 
 [7]
 Congressman Florio seems plainly to have been speaking both of soft-hammer wastes (standards for which would come into play "[i]f EPA fails to meet either of its first two deadlines") and national capacity variance wastes (these statutory provisions would be invoked "if there is no treatment capacity"). The fact that the Congressman spoke of the two in tandem lends further support to the EPA's conclusion that both sorts of waste should be subject to the same treatment requirements