# Exchange Authority for Kaloko Honokohau
# National Historical Park

The Department of the Interior is authorized to acquire privately held land for the Kaloko Honokohau National Historical Park by exchanging it for surplus federal land of equivalent value within the State of Hawaii. Its exchange authority does not, however, extend to excess as well as surplus federal land, nor to land outside the State of Hawaii.

The power to dispose of property of the United States is committed under the Constitution to Congress, and the Executive's disposition of federal land in any particular case must be undertaken in accordance with whatever rules Congress has established for this purpose. In this case, the Department of the Interior's specific exchange authority in connection with the Park is presumptively limited by the otherwise applicable general legal restrictions on federal land exchange transactions.

May 20, 1982

## MEMORANDUM OPINION FOR THE
## UNDERSECRETARY OF THE INTERIOR

This responds to your request for the Department's legal opinion on two issues relating to your authority to acquire land for the Kaloko Honokohau National Historical Park in Hawaii. Both issues involve Interior's authority under the 1980 provision in its appropriations act to acquire what is now privately owned land by exchanging it for federal land of equivalent value. The first question is whether both "surplus" and "excess" federal real properties are available for such an exchange under the 1980 law. The second question is whether federal land in other states may be exchanged for the privately held Hawaiian land in question.

The General Services Administration (GSA), in an opinion of its General Counsel dated August 25, 1981, takes the position that only intrastate exchanges of surplus real property are authorized. The Assistant Solicitor of the Interior and counsel for the private property owners disagree, taking the position that the 1980 law authorizes interstate exchanges of both surplus and excess property.[1] For reasons stated below, we believe that the result reached by the GSA is correct,

---

[1] See Aug. 14, 1981, Memorandum to the Assistant Secretary for Fish and Wildlife and Parks, and the letter of Sept. 14, 1981, from Carla A Hills to Stephen Thayer, Assistant to the Administrator of GSA The legal opinions cited are confined to the issue raised by the proposed exchange of land in different states, and do not discuss the question whether both "surplus" and "excess" property may be exchanged. We gather that disagreement with respect to the latter question arose sometime after these opinions were written, and we have not been made aware of the arguments advanced in support of either position

and that the only land authorized for exchange by the 1980 law is federal surplus land within the State of Hawaii.

## I. Legislative Background

The Kaloko Honokohau National Historical Park was established by the National Parks and Recreation Act of 1978 (1978 Act), Pub. L. No. 95–625, 92 Stat. 3499, "to provide a center for the preservation, interpretation, and perpetuation of traditional native Hawaiian activities and culture . . . ." *See* § 505(a) of the 1978 Act, 16 U.S.C. § 396d(a) (Supp. II 1978). Authority to acquire land for the Park was given to the Secretary of the Interior in § 505(b) of the 1978 Act:

> Except for any lands owned by the State of Hawaii or its subdivisions, which may be acquired only by donation, the Secretary is authorized to acquire the lands described above by donation, exchange, or purchase through the use of donated or appropriated funds, notwithstanding any prior restriction of law.

16 U.S.C. § 396d(b) (Supp. II 1978).

Since the Park's establishment, Congress has failed to appropriate any funds to acquire privately held land for the Park. Nor, apparently, has it been possible otherwise to acquire the particular property in question.

In 1980, additional legislation was passed to augment the Secretary's authority to acquire land under the 1978 Act. This legislation, enacted as a floor amendment to your Department's appropriation act for fiscal 1981, Pub. L. No. 96–514, 94 Stat. 2960, reads in its entirety as follows:

> Notwithstanding any other provision of law, the Secretary is authorized and shall seek to acquire the lands described in Section 505(a) of the Act of November 10, 1978 (92 Stat. 3467) by first acquiring Federal surplus lands of equivalent value from the General Services Administration and then exchanging such surplus lands for the lands described in Section 505(a) of that Act with the land owners. Exchanges shall be on the basis of equal value, and any party to the exchange may pay or accept cash in order to equalize the value of the property exchanged.

## II. Whether Excess Property as Well as Surplus Property Is Available for Exchange

With respect to your first question, we find no support in the terms of the 1980 appropriation act or its legislative history for an argument that "excess" as well as "surplus" real property should be available for an exchange transaction. By its terms, the 1980 provision refers only to "federal surplus lands" held by the General Services Administration. Under the Federal Property and Administrative Services Act of 1949, 40 U.S.C. §§ 471–514, the law pursuant to which the

GSA holds and administers federal property, the terms "surplus" and "excess" denote two quite distinct categories of property.[2] Property determined by one agency to be in "excess" of its needs can be sold or otherwise disposed of outside the federal government as "surplus" only when and if the Administrator of General Services determines that no other executive agency needs it. *See* 40 U.S.C. § 483(a)(1) and 41 C.F.R. § 101–47.201–1.

When the 1980 legislation speaks of the acquisition of "surplus" property from the GSA, we believe it reasonable to assume that Congress intended that term to have its ordinary meaning under the Property Act. *See* 2A Sutherland Statutes and Statutory Construction § 47.27 (4th ed. 1973). *See also Watt* v. *Alaska,* 451 U.S. 259, 267 (1981) (two statutes dealing with the same subject must be read to give effect to each other if possible "while preserving their sense and purpose"). This assumption is confirmed by the legislative history of the 1980 provision. In explaining the legislation he had introduced, Senator Hatfield stated that "[a]ll this does is to give, in effect, authorization to the GSA and the Forest Service [sic] under existing rules, regulations, and laws" to attempt to acquire the private property through an exchange transaction. 126 Cong. Rec. 29665 (1980).[3]

### III. Whether Interstate Land Exchanges Are Authorized by the 1980 Provision

As a general matter, the power to dispose of property of the United States is committed to Congress by Article IV, section 3, clause 2 of the Constitution. This power of Congress is "exclusive," and "only through its exercise in some form can rights in lands belonging to the United States be acquired." *Utah Power and Light Co.* v. *United States,* 243 U.S. 389, 404–05 (1917). It follows that Congress may "prescribe the conditions upon which others may obtain rights in them." *Id.* at 505. Accordingly, the Secretary's authority under both the 1978 and 1980 statutes to dispose of federal lands by exchanging them for privately owned lands for the Park must be exercised in accordance with whatever particular rules Congress has established. One set of rules applicable generally to land exchange transactions in the National Park System is set forth in 16 U.S.C. § 460*l*–22(b):

> The Secretary of the Interior is authorized to accept title to any non-Federal property or interest therein within a unit of the National Park System or miscellaneous area under his administration, and in exchange therefor he may convey to the grantor of

---

[2] "Excess property" is defined in § 3(e) of the Property Act as "any property under the control of any Federal agency which is not required for its needs and the discharge of its responsibilities, as determined by the head thereof." 40 U S C. § 472(e) "Surplus property" is defined in § 3(g) as "any excess property not required for the needs and the discharge of the responsibilities of *all* Federal agencies, as determined by the Administrator [of General Services]." 40 U S C § 472(g) (emphasis added).

[3] When Congress has made an exception to general practice under the Property Act with respect to the administration and disposition of excess property, it has been explicit *See, e g* , 40 U S.C. § 483(a)(2) (GSA must transfer to the Secretary of the Interior any excess real property located within an Indian reservation, to be held in trust for the use and benefit of the tribe, without regard to whether any other Federal agency needs or wants to acquire it for its own use).

such property or interest any Federally owned property or interest therein under his jurisdiction which he determines is suitable for exchange or other disposal *and which is located in the same State as the non-Federal property to be acquired* . . . . The values of the properties so exchanged either shall be approximately equal, or if they are not approximately equal, the values shall be equalized by the payment of cash to the grantor from funds appropriated for the acquisition of land for the area, or to the Secretary as the circumstances require. (Emphasis supplied.)

Section 460*l*–22(b) was enacted as § 5(b) of the Land and Water Conservation Fund Amendments of 1968, Pub. L. No. 90–401, 82 Stat. 356. By its terms, it applies to all land exchange transactions in "the National Park System or miscellaneous area[s] under [the Secretary's] jurisdiction." Its legislative history indicates that Congress intended to impose "consistent" limiting conditions on the Secretary's authority to acquire private land for national parks by exchange, confining the land available for such exchanges to "federally owned tracts under the jurisdiction of the Department of the Interior in the same State, or States, as the national park unit." S. Rep. No. 1071, 90th Cong., 2d Sess. 8–9 (1968). In 1970 the general applicability of § 460*l*–22(b) to all land exchange transactions in the National Park System (unless "in conflict with any . . . specific provision") was affirmed by § 2(b) of Pub. L. No. 91–383, 84 Stat. 826, codified at 16 U.S.C. § 1c(b). *See* H.R. Rep. No. 1265, 91st Cong., 2d Sess. 8 (1970) (letter from Secretary of the Interior Hickel).[4]

Your Department does not contend, nor do we think it reasonably could, that the general limitations on the Secretary's land exchange authority contained in § 460*l*–22(b) are not applicable to exchanges under § 505(b) of the 1978 Act. We agree, then, that under the 1978 Act standing alone the Secretary would have been authorized to acquire privately owned land for the Park by exchange only when the federal property to be exchanged is (1) "under his jurisdiction" and (2) "located in the same State as the non-Federal property to be acquired." The question thus arises whether the 1980 enactment modified the Secretary's exchange authority under the 1978 Act.

Your Department interprets the 1980 enactment to authorize the Secretary to acquire from GSA federally owned land in other states in order to exchange it for the privately owned land in Hawaii. That is, you believe the 1980 provision carves out an exception to the intrastate restriction which otherwise governs all land exchanges transactions in the national park system. Your position in this regard appears to be based on a broad reading of the 1980 provision's

---

[4] When Congress has made an exception to the intrastate restriction of § 460*l*–22(b), it has been quite specific *See. e.g.,* 16 U S.C § 459c–2(c) (Secretary may acquire land for Point Reyes National Seashore by exchanging property under his jurisdiction "within California and adjacent States"); 16 U.S C. § 459f–1(b) (Assateague National Seashore; land in Maryland or Virginia may be exchanged); 16 U.S C. § 460o–1(a) (Delaware Water Gap National Recreation Area; only land in Pennsylvania, New Jersey or New York may be exchanged), 16 U.S.C. § 460r–1(a) (Bighorn Canyon National Recreation Area; land in Montana or Wyoming may be exchanged); 16 U.S.C § 460u–1(a) (Indiana Dunes National Seashore, land in Indiana or Illinois may be exchanged)

254

introductory phrase, "[n]otwithstanding any other provision of law." *See* Assistant Solicitor Watts' memorandum of Aug. 14, 1981. We cannot agree that the phrase accomplishes so much.

At the outset, it is not clear from the text of the 1980 provision whether the introductory "notwithstanding" phrase modifies the specific directive in this provision to acquire surplus land from GSA for the purpose of exchange, or whether it modifies the Secretary's statutory exchange authority itself. If the former reading were correct, the phrase would not supersede more generally applicable legal conditions governing an exchange transaction, such as § 460*l*–22(b). If the latter reading were correct, then the introductory phrase would have to be read to repeal *every* statutory restriction on or regulation of the Secretary's power to acquire the land in question. *See, e.g.,* 40 U.S.C. § 255 or 42 U.S.C. § 4651. This latter reading would, in rendering all such restrictions and regulations legally ineffective, repeal by implication all such restrictions and regulations.

Repeals by implication are not favored, *see Watt* v. *Alaska, supra,* 451 U.S. at 267. We would be, therefore, reluctant to give such a broad reach to this ambiguous provision in the 1980 enactment without clearer textual expression of legislative intent. *See also TVA* v. *Hill,* 437 U.S. 153, 189–90 (1978) (exceptions to a generally applicable statute will not be implied from subsequent legislation, particularly where the subsequent legislation is an appropriations act). In addition, as pointed out in notes 3 and 4 *supra,* this particular problem of statutory construction arises in a context in which Congress has historically legislated with care and specificity when authorizing exceptions to the general congressionally established rules governing acquisition and disposal of property by the Executive. Accordingly, we would normally give the "notwithstanding" phrase the narrower of the two readings absent other persuasive evidence of congressional intent to the contrary.

The brief legislative history of the 1980 law, found at 126 Cong. Rec. 29665 (1980), confirms, rather than contradicts, our reading of the 1980 enactment. Senator Hatfield described the difficulty created by Congress' failure to appropriate funds to purchase the privately held Hawaiian land for the Park, and explained his proposed legislative solution in the following terms:

> Mr. President, this is one of those very interesting situations where we are trying to correct an inequity that exists at this time. The Congress of the United States authorized the establishment of a park in Hawaii and this park was to be developed out of a large parcel of private ownership. The only problem is that the Government has not had the appropriations to make this purchase, and it has now been appraised at about $60 million.
>
> The owners of this property are people of modest income, of increasing age. In fact, I believe the owner is now near 70.
>
> They realize that, for the first time, if they should die their heirs would be thrust into a very untenable position of having to pay

> inheritance tax on estate ownership, including this $60 million appraised value land.
>
> They have asked for relief in this situation. The GSA and the Forest Service [sic] have agreed that there is land in Hawaii that they could easily exchange and thereby create a fluid landholding as against this one buyer market situation they face.
>
> All this does is to give, in effect, authorization to the GSA and the Forest Service [sic] under existing rules, regulations, and laws to proceed to redress this particular hardship that has been placed upon these innocent people.

This passage reveals no intention to remove the otherwise applicable intrastate restriction of 16 U.S.C. § 460*l*–22(b). Indeed, Senator Hatfield seems to have assumed that the transaction to be facilitated by his legislation would involve only federal surplus land located in Hawaii ("The GSA and the Forest Service [sic] have agreed that there is land in Hawaii that they could easily exchange. . . ."). This, coupled with his final reference to "existing rules, regulations, and laws" which we have already quoted above, convinces us that the 1980 legislation was not intended to carve out an exception to § 460*l*–22(b) so as to permit intrastate land exchanges.

The most plausible explanation for the introductory "notwithstanding" phrase is found in what has been described to us by the Assistant Solicitor as the GSA's pre-1980 reluctance to make available surplus property for the purposes of exchange except in accordance with the strict conditions imposed by its own regulations.[5] The 1980 legislation was, we conclude, intended to encourage the GSA to make available surplus property for the exchange by providing the specific legal authority which the GSA apparently felt was insufficient under the 1978 law. It was not, however, intended to remove legal restrictions which would otherwise be applicable to the exchange itself.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[5] *See* 41 C.F.R. § 101–47 301–1(c) ("surplus real property shall be disposed of by exchange for privately owned property only for property management considerations such as boundary realignment or provision of access or in those situations in which the acquisition is authorized by law, the requesting Federal agency has received approval from the Office of Management and Budget and clearance from its congressional oversight committees to acquire by exchange, and the transaction offers substantial economic or unique program advantages not otherwise obtainable by any other method of acquisition.").