**STATE OF NEW MEXICO, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 526–85 T.**

United States Claims Court.

Dec. 30, 1986.

**430**

Paul G. Bardacke, Atty. Gen., Santa Fe, N.M., for plaintiff. Norman S. Thayer, Sutin, Thayer & Browne, Albuquerque, N.M., of counsel.

John J. McCarthy, Washington, D.C., with whom was Asst. Atty. Gen. Roger M. Olsen, and Mildred L. Seidman, for defendant.

1. Plaintiff bifurcates the issues of liability and damages, and has yet addressed only the issue of liability; therefore, plaintiff has sought partial summary judgment.

2. This case was originally filed and decided in the United States District Court for the District of New Mexico. *New Mexico v. Regan,* Civ. No. 81–452–M (decided June 8, 1983). On appeal, the United States Court of Appeals for the Tenth Circuit found that the District Court lacked jurisdiction to decide the case and that the case properly should be filed in the United States Claims Court. A petition for *certiorari* was filed in the United States Supreme Court. The petition was denied. *New Mexico v. Regan,* 745 F.2d 1318, 1323 (10th Cir.1984), *cert. denied,*

OPINION

HORN, Judge.

At issue in this case, brought by the State of New Mexico, is the method of calculation to be used to determine the State's share of royalties from crude oil produced on federally owned land located in New Mexico due under the Act of February 25, 1920, ch. 85, 41 Stat. 437, as amended, 30 U.S.C. § 226(a) (1976) (The Mineral Leasing Act of 1920). The plaintiff, State of New Mexico, has alleged that the State's share should be calculated before payment by the United States of taxes due under the subsequently enacted Crude Oil Windfall Profit Tax Act of 1980, Pub.L. No. 96–223, 94 Stat. 229, 26 U.S.C. § 4986, *et seq.* (1982) (The Windfall Profit Tax Act). The defendant, United States, has argued that the State's share should be calculated only after the taxes due are deducted from the royalties generated.

The case is before the Court on defendant's motion for summary judgment and plaintiff's motion for partial summary judgment.[1] The two motions were filed simultaneously. Both plaintiff and defendant have stated that there are no material facts in dispute and that the only issue before the Court is a legal issue of statutory construction. The case is, therefore, appropriate for disposition on summary judgment at this time.[2]

For the reasons discussed herein, defendant's motion for summary judgment is

*New Mexico v. Baker,* 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985).

In the Claims Court, this case was originally assigned to Judge Wood. Upon his retirement from the Court, the case was reassigned to Judge Horn. Prior to undertaking any proceedings in the case, Judge Horn inquired in writing of both plaintiff and defendant whether either party wished to raise an objection to the assignment, due to her previous employment, which was described in the exchange of correspondence. Both parties indicated in writing that they had no objection to the reassignment to Judge Horn. At the oral argument on the cross motions for summary and partial summary judgment, the history regarding this exchange of correspondence was placed on the record.

granted and plaintiff's motion for partial summary judgment is denied.

## BACKGROUND

In 1920, Congress authorized the Secretary of the Interior to lease certain federally owned lands which contain unappropriated oil or gas deposits. Section 17, Act of February 25, 1920, ch. 85, 41 Stat. 437, as amended, 30 U.S.C. § 226(a) (1976). Section 17 provides that these lands may be leased to the highest, responsible bidder, by competitive bidding, for the production of crude oil, pursuant to regulations promulgated by the Secretary. Section 17 also establishes certain criteria for such leases, including acreage limitations and that the royalty payment under a lease shall not be less than 12½ per centum in amount or value of the production. 30 U.S.C. § 226(b) and (c) (1976). All royalty payments accruing to the United States as a result of an oil or gas lease under that Act are required to be paid in oil or gas pursuant to Section 36 of the Mineral Leasing Act of 1920. 30 U.S.C. § 192 (1976). Upon the sale of the oil or gas, the royalty payments are converted into money.

The apportionment of the royalties prior to the enactment of the Windfall Profit Tax is not contested in this case. Before the passage of the Windfall Profit Tax, the Secretary had leased Federal lands, including lands located in New Mexico, and had received the royalty payments in oil or gas.

Following the sale of the oil and gas, the Secretary had paid all the money received from the royalties into the United States Treasury, to be apportioned in accordance with the formula set forth in Section 35 of the Mineral Leasing Act of 1920, as discussed below. 30 U.S.C. § 191 (1976).

On April 2, 1980, Congress imposed an excise tax on windfall profits realized from domestic crude oil produced. The Act was made retroactive to February 29, 1980. See the Crude Oil Windfall Profit Tax Act of 1980, Pub.L. No. 96–223, § 101, 94 Stat. 229, 26 U.S.C. § 4986, *et seq.* (1982). The tax was imposed on crude oil at the time of its removal from the premises and the tax liability resulting from the oil production was charged to the producer.[3] The amount of the tax assessed on the oil removed is based upon a three-tier percentage schedule based upon the difference between the removal or market price of the oil and the adjusted base price prior to decontrol of oil prices. 26 U.S.C. §§ 4987, 4988 and 4989. The Windfall Profit Tax Act specifically exempts certain categories of oil from taxation, but oil produced on federal lands is not so exempted. 26 U.S.C. § 4991. The method of imposition and collection of the tax is likened to a severance tax.[4] The first purchaser of the oil is required to withhold from the purchase price an amount equal to the amount of taxes imposed on oil removed, except when provided otherwise by regulations of the Secretary of the Treasury.[5] 26 U.S.C. § 4995.

---

**3.** Section 101 of the Crude Oil Windfall Profit Tax Act of 1980, 94 Stat. 229, provided for the following amendment to the Internal Revenue Code of 1954.

SEC. 4986. IMPOSITION OF TAX.

(a) *Imposition of Tax.*—An excise tax is hereby imposed on the windfall profit from taxable crude oil removed from the premises during each taxable period.

(b) *Tax Paid by Producer.*—The tax imposed by this section shall be paid by the producer of the crude oil.

26 U.S.C. § 4986.

**4.** Generally, severance taxes are imposed on the owners of royalty interests as a result of the production of oil and other minerals. When imposed on oil, these taxes are imposed on the units of production as a fixed fee per barrel or as a percentage of the value of each barrel.

Severance taxes are normally paid by the first purchaser of the oil, who withholds an amount equal to a statutory tax assessment from the amount paid to the producer and royalty owners. S.Rep. No. 96–394, 96th Cong., 1st Sess. 55 (1980), U.S.Code Cong. & Admin.News 1980, pp. 410, 464.

**5.** Shortly after enactment of the Tax Act, the Secretary of the Treasury promulgated temporary regulations which provided for the first purchaser of oil from federal lands to withhold the windfall profit tax and deposited it in the United States Treasury, 26 U.S.C. § 4995 (1982); Treas.Reg. § 150.4995–1(a) (1980). In January 1981, the Secretary amended the temporary regulations and required the purchaser of federal oil to make one single payment to the Federal Treasury, to include taxes and royalties. 46 Fed.Reg. 4873, 26 C.F.R. Part 150.

The plaintiff argues that the State's fifty percent share is prescribed by the Mineral Leasing Act of 1920, and thus cannot be diminished by the subsequent enactment of the Windfall Profit Tax Act, without a statutory declaration by Congress of a specific intent to do so. Plaintiff, however, has stated repeatedly in its briefs and at oral argument, however, that it does not have an economic interest in the oil produced. Plaintiff relies upon the alleged lack of specifically, manifested intent on the part of Congress in the Windfall Profit Tax Act of 1980 to amend the Mineral Leasing Act of 1920, and the absence of taxation on other mineral royalty programs which confer 50% royalty payments to the State, to support its position that the royalty payment to New Mexico should not be diminished by The Windfall Profit tax assessment.

Defendant has maintained that the crude oil produced on federally owned land in the State of New Mexico is subject to the excise tax imposition of the Windfall Profit Tax Act, prior to payments of royalties into the United States Treasury. The defendant relies upon the general rules of statutory construction and the legislative history of the Windfall Profit Tax Act to support its contention that the payments due the State from federal royalties be computed on the net sum remaining after the payment of the excise tax, rather than on the gross royalties, based upon oil produced, received by the Federal Government.

## DISCUSSION

Although an important issue for both parties, the dispute between the plaintiff and the defendant is quite clear: Is the State of New Mexico entitled to calculate the 50% share of royalties due it under the Mineral Leasing Act of 1920 before or after deduction of the taxes due to the United States Treasury under the Windfall Profit Tax Act of 1980?

Both parties rely primarily on the plain language of Section 35 of the Mineral Leasing Act of 1920, as amended, (30 U.S.C. § 191) (1976). Plaintiff relies on Section 35

of that Act to support its position that the State is entitled to a 50% share of royalties accruing from federal leases in that State, undiminished by any prior deduction of windfall profit taxes due to the Treasury of the United States. The defendant argues that this same Section 35 of the Mineral Leasing Act of 1920 does not provide for the states to receive 50% of the gross royalties, but rather provides for 50% allocation to the states of the money paid into the Treasury, realized from royalties from production on Federal lands located in the respective State, minus a deduction to meet the tax obligation.

Section 35 of the Mineral Leasing Act of 1920, as amended, provides that—

All money received from sales, bonuses, royalties, and rentals of the public lands under the provisions of this chapter and the Geothermal Steam Act of 1970 ... shall be paid into the Treasury of the United States; 50 per centum thereof shall be paid by the Secretary of the Treasury ... to the State other than Alaska within the boundaries of which the leased lands or deposits are or were located; ... and excepting those from Alaska, 40 per centum thereof shall be paid into, reserved, appropriated, as part of the reclamation fund created by the Act of Congress known as the Reclamation Act, approved June 17, 1902, and of those from Alaska, ... 90 per centum thereof shall be paid to the State of Alaska for disposition by the legislature thereof: Provided, That all moneys which may accrue to the United States under the provisions of this chapter and the Geothermal Steam Act of 1970 from lands within the naval petroleum reserves shall be deposited in the Treasury as "miscellaneous receipts", as provided by section 7433(b) of Title 10. All moneys received under the provisions of this chapter and the Geothermal Steam Act of 1970 not otherwise disposed of by this section shall be credited to miscellaneous receipts ... 30 U.S.C. § 191 (1976).

The Mineral Leasing Act of 1920 is silent as to when the apportionment of money

derived from the sale of royalties occurs. There is, however, also nothing in the statutory scheme of the Mineral Leasing Act of 1920 to preclude the imposition of a tax, such as the Windfall Profit Tax, before the State share of the royalty is calculated.[6]

Restated in simple statutory terms, deleting less important words for present purposes, Section 35 of the Mineral Leasing Act mandates that:

> "All *money* received from sales ... royalties ... shall be paid into the Treasury ...; 50 per centum thereof shall be paid ... to the State other than Alaska within the boundaries of which the leased lands or deposits are or were located; ...."
> (Emphasis added.) 30 U.S.C. § 191 (1976).

The statute clearly states that the 50 percent calculation should be made from *"money"* received.

Also included as a significant requirement in the Mineral Leasing Act of 1920 is that royalty payments to the United States on oil produced on Federally leased lands must be in the form of oil or gas. 30 U.S.C. § 192 (1976). This royalty oil, therefore, must be sold before the royalties are converted into money. Significantly, both sides to this dispute have agreed that the economic interest in the oil produced is owned by the United States.[7] Logically, therefore, given the wording of Section 35 of the Mineral Leasing Act of 1920, it would appear that the State's 50% interest in "money" received from the royalties does not become fixed until after the sales transaction of the oil produced occurs and the royalties have been converted into cash.

Although reaching different conclusions, the parties rely on the same principles of statutory construction noting that "[t]he starting point in every case involving construction of a statute is the language itself." *Watt v. Alaska*, 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981), quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975). See also *Rubin v. United States*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). Neither party has indicated that there is ambiguity in the rather conventional language employed in pertinent parts of the Mineral Leasing Act of 1920 or the Windfall Profits Tax of 1980.

In addition to mandating that the State receive a share of the royalties, Section 35 of the Mineral Leasing Act of 1920 also

---

**6.** Nor can we rely on the minimal body of relevant case law to help us interpret the Act in this situation because the one case which is seemingly related, is distinguishable. *Watt v. Alaska*, 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981).

Pursuant to an amendment to Section 401(c) of the Wildlife Sharing Refuge Act, 49 Stat. 383, as amended, 16 U.S.C. § 715s(c), twenty-five percent of the monies received from the royalties on wildlife refuges was to be paid to the county in which the refuge lies and the remaining funds were to be used by the Department of the Interior for public purposes. In effect, Alaska, because of the addition of one word, "minerals" was subject to lose its 90% allocation of the monies received from royalties derived on wildlife refuges, pursuant to the Mineral Leasing Act. This drastic reallocation would have been accomplished with the addition of one single word and with no accompanying explanation in the legislative history.

Having reviewed the amendment to Section 401(c) of the Wildlife Refuge Sharing Act, in *Watt v. Alaska*, the Supreme Court found that the dispute stemmed from the addition of the word "minerals" to the list of refuge resources in Section 401(c). The Court in *Watt* opined that there was "no 'clearly expressed congressional intention' to repeal this provision" of Section 35 of the Mineral Leasing Act of 1920 which allocated, *inter alia*, 90% of the revenues resulting from the sale of royalties derived from minerals on wildlife refuges in the State of Alaska, to that state. 451 U.S. at 273, 101 S.Ct. at 1681.

In contrast, the case now before the Court involves a subsequently enacted tax statute, which includes in the legislative history a discussion of the potential impact of the enactment of the Windfall Profit Tax Act of 1980 on the Mineral Leasing Act of 1920, specifically noting that oil produced on Federal lands will not be exempt. Moreover, construction of the two Acts in the instant case does not produce the radical effect of eradicating the State's entire share, rather the State's share may be diminished, in proportion to the amount of oil produced.

**7.** In the papers filed with the Court and at oral argument, plaintiff, State of New Mexico, clearly conceded that it does not have an economic interest in the oil produced.

dictates that 40% of the royalties received be paid into the reclamation fund created under the Reclamation Act of 1902 and that 10% go to Treasury's Miscellaneous Receipts Account.

■ Another basic principle of statutory construction prohibits an interpretation that renders a statute absurd or redundant. *Singer v. United States*, 323 U.S. 338, 344, 65 S.Ct. 282, 285, 89 L.Ed. 285 (1945), and *United States v. Ryan*, 284 U.S. 167, 175, 52 S.Ct. 65, 68, 76 L.Ed. 224 (1931). If the State's payment were to be computed on gross royalties first, followed by the tax assessment, before allocation of the payments to the reclamation fund and the Treasury Miscellaneous Receipts Accounts, the full tax burden would be placed on the reclamation fund and the Miscellaneous Receipts Accounts. Depending on the dollars received from the sale of royalty oil, plaintiff's interpretation might, in fact, create the anomalous situation of leaving no money for payment into the reclamation fund and the Miscellaneous Receipts Account of the Treasury, after payment of the State share. Although Congress intended that these two funds receive smaller percentages of the royalty dollars, it nonetheless intended that each fund receive the allotted percentage payment.

■ Based on the above discussion of the language of the Mineral Leasing Act of 1920, the Court concludes that the plain meaning of the words of that Act does not forbid computation of a tax due to the United States Treasury on oil produced from royalty leases, prior to computation of the State's royalty share.

The remaining issue, therefore, is to determine the impact of the Crude Oil Windfall Profit Tax Act of 1980 on the calculation of the State's share of "money" received from the royalty oil. The Windfall Profit Tax Act of 1980 was passed in response to Congressional concerns that windfall profits were being realized due to exhorbitant increases in the price of oil. In response to the rapid rise in oil prices and what was believed to be an inadequate supply, Congress assessed the tax for essentially a ten-year period. The purpose of the tax was clearly defined to aid the country's energy demand. The purpose included provisions to create revenues, to encourage energy conservation, to promote production from alternate energy sources, and to ease the burden of higher energy prices on lower-income households. S.Rep. No. 96–394, 96th Cong., 1st Sess. 1–8 (1980); H.Rep. No. 96–304, 96th Cong. 1st Sess. 1–11 (1980).

Section 101(a) of the Windfall Profit Tax Act of 1980 amends the Internal Revenue Code of 1954 by adding Chapter 45: Windfall Profit Tax on Domestic Crude Oil. The following sections are pertinent to the case at issue:

SEC. 4986: IMPOSITION OF TAX.

(a) *Imposition of Tax.*—An excise tax is hereby imposed on the windfall profit from taxable crude oil removed from the premises during each taxable period.

(b) *Tax Paid by Producer.*—The tax imposed by this section shall be paid by the producer of the crude oil. 26 U.S.C. § 4986.

Section 4996(a)(1) defines the term "producer" as: "The holder of the economic interest with respect to the crude oil". (26 U.S.C. § 4996(a)(1)).

The Windfall Profit Tax Act also specifically delineates the applicable exemptions under the Act. Consequently, for the Windfall Profit Tax to be inapplicable to oil removed from Federal lands, an exemption from taxation would have to be included in the statute. Such an exemption cannot be read into a tax statute. The Act reads:

SEC. 4991. TAXABLE CRUDE OIL; CATEGORIES OF OIL.

(a) *Taxable Crude Oil.*—For purposes of this chapter, the term 'taxable crude oil' means all domestic crude oil other than exempt oil.

(b) *Exempt Oil.*—For purposes of this chapter, the term 'exempt oil' means—

(1) any crude oil from a qualified governmental interest or a qualified charitable interest,

(2) any exempt Indian oil,

(3) any exempt Alaskan oil, and

(4) any exempt front-end oil.

26 U.S.C. § 4991.

Three of the exemptions are not pertinent here and do not merit discussion. The exemption for a "qualified governmental interest" warrants discussion.

The term "qualified governmental interest" as defined in Section 4994(a)(1) of the Windfall Profit Tax Act means:

"... an economic interest in crude oil if—

"(A) such interest is held by a State or political subdivision thereof or by an agency or instrumentality of a State or political subdivision thereof,...."

26 U.S.C. § 4994(a)(1).

No exemption is provided for an "economic interest" held by the Federal government. Moreover, Section 4996(g) of the Act, entitled "No Exemptions From Tax," specifically provides:

"No taxable crude oil and no producer of such crude oil, shall be exempt from the tax imposed by this chapter except to the extent provided in this chapter or in any provision of law enacted after the date of the enactment of this chapter which grants a specific exemption by reference to this chapter, from the tax imposed by this chapter.

26 U.S.C. § 4996(g).

The Supreme Court has defined a holder of an economic interest as a person who has a right to share in the oil produced. *Palmer v. Bender*, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933). More specifically, the Supreme Court, upon review of a question regarding tax assessment on royalty payments, pursuant to a contractual agreement between a vendee and vendor, has held that:

The holder of a royalty interest—that is, a right to receive a specified percentage of all oil and gas produced during the term of the lease—is deemed to have 'an economic interest' in the oil in place which is depleted by severance. [Citations omitted.] Cash bonus payments,

when included in a royalty lease, are regarded as advance royalties, and are given the same tax consequences. *Anderson v. Helvering*, 310 U.S. 404, 409, 60 S.Ct. 952, 954, 84 L.Ed. 1277 (1940).

■ Consequently, for New Mexico to claim a "qualified governmental interest" based upon the statutory definition in the Windfall Profit Tax Act and the caselaw, it would have to demonstrate that it, not the Federal government, owned an interest in the oil properties. As indicated above, New Mexico has stated repeatedly in its brief and during oral argument that it does not hold an economic interest in the oil. Moreover, New Mexico has submitted that the holder of the economic interest in the oil is the United States. It is, therefore, clear that New Mexico does not possess a "qualified governmental interest" in the oil produced on federal lands, thereby exempting any portion of the oil produced on Federal lands. As a result none of the oil produced on the Federal land, although physically located in the State of New Mexico, is exempted from coverage under the Windfall Profit Tax Act.

Because the exemptions delineated in Section 4991 do not include an exemption for oil produced on Federal lands and the Court has found no other references in the statute or legislative history to demonstrate that Congress intended otherwise, the inclusion in the tax obligation is deemed to be a Congressional choice. *HCSC-Laundry v. United States*, 450 U.S. 1, 8, 101 S.Ct. 836, 839, 67 L.Ed.2d 1 (1981); *Sonzinsky v. United States*, 300 U.S. 506, 512, 57 S.Ct. 554, 555, 81 L.Ed. 772 (1937); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934).

■ This Court, therefore, must find that all the oil produced on Federal lands leased in the State of New Mexico is subject to the provisions of The Crude Oil Windfall Profits Tax of 1980. Neither the Federal government nor the State are entitled to exempt any portion of that produc-

tion from the tax liability established by the Congress.

In the briefs and at oral argument, there was discussion of the Regulations which prescribe the methodology by which payment of the tax obligation was and is made to the Treasury. Given the absence of an exemption for oil produced on Federally leased lands in which the economic interest lies with the Federal government, the Court finds those discussions do not alter its view of the severance tax obligation incurred on the oil at the time of production.

The wording of Section 35 of the Mineral Leasing Act leads to the conclusion that the State's share does not become fixed until after the sales transaction of the oil produced occurs and the royalties have been converted into cash. Furthermore, the excise tax in Section 4986 of The Windfall Profit Tax Act of 1980 is imposed on "crude oil removed from the premises." We find it appropriate, therefore, given the plain language of the two statutes at issue in this case, to calculate the tax burden on the oil at the time of production, prior to calculation of the State's share.

■ Although the Court recognizes as discussed above that the initial inquiry in a case involving statutory construction is the language itself, if additional relevant considerations are available, further exploration into these additional matters is not precluded. *Watt v. Alaska, supra* 451 U.S. at 266, 101 S.Ct. at 1677, *Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976); *United States v. American Trucking Association, Inc.,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940), and *Boston Sand Co. v. U.S.,* 278 U.S. 41, 48, 49 S.Ct. 52, 53, 73 L.Ed. 170 (1928). Moreover, the Court is mindful not to get so caught up in the literal meaning of words that it allows the dictionary to create a fortress and does not examine the purpose of the enactment and the circumstance occurring at the time of the enactment. *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct.

511, 512, 36 L.Ed. 226 (1892); *United States v. Ryan,* 284 U.S. 167, 175, 52 S.Ct. 65, 68, 76 L.Ed. 224 (1931); *Cabell v. Markham,* 148 F.2d 737, 739 (2nd Cir.1945), aff'd 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

Plaintiff has argued that ambiguity in this case arises out of the fact that it is impossible to give full effect to both the Mineral Leasing Act of 1920 and The Windfall Profit Tax Act of 1980. The Court does not agree. In fact, there is a clear indication that the legislators specifically intended that the Windfall Profit Tax of 1980 apply to Federal royalty oil.

This is made clear in language included in the House Conference Report:

*House bill.*—The House bill provides that if an economic interest in crude oil is held by a State or political subdivision thereof, or by an educational institution which is an agency or instrumentality of any of the net income received pursuant to such interest is dedicated to public education, then the windfall profit tax would not be imposed with respect to crude oil properly allocable to such interest. The exemption would not apply to the extent another party had an economic interest in the production.

Federal royalty oil, including oil production from a National Petroleum Reserve and royalties from Federal leases, is subject to tax under the House bill. *Senate amendment.*—The Senate amendment extends the House bill's exemption to oil used for any public purpose.

The Senate amendment also exempts from tax oil production owned by the Federal government.

*Conference agreement.*—The conference agreement follows the Senate amendment with respect to oil owned by State and local governments, and the House bill with respect to oil owned by the Federal government.

H.Conf.Rep. No. 96–817; 96th Cong., 2d Sess. 107, U.S.Code Cong. & Admin.News 1980, p. 660.

Congress is empowered by the Constitution to levy taxes on sources of revenue. Exercising its Constitutional powers, "Congress may select the subjects of taxation, choosing some and omitting others." *Sonzinsky v. United States*, 300 U.S. 506, 512, 57 S.Ct. 554, 555, 81 L.Ed. 772 (1937). It is the will of Congress which controls and in the absence of language which gives evidence of a different intent, the words should be interpreted "so as to give a uniform application to a nationwide scheme of taxation." *Lyeth v. Hoey*, 305 U.S. 188, 194, 59 S.Ct. 155, 158, 83 L.Ed. 119 (1938); *Burnet v. Harmel*, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199 (1932).

In the case currently before the Court there is no clear expression or implication that it was the will of Congress to provide for any exemptions from taxation under the Windfall Profit Tax for oil removed from Federally owned land. This Court, therefore, is obliged to honor the Congressional choice.

For the foregoing reasons, plaintiff is not entitled to recover and the Clerk is directed to enter judgment dismissing the complaint.

IT IS SO ORDERED.