151 F.3d 1162
 47 ERC 1065, 28 Envtl. L. Rep. 21,407,
98 Cal. Daily Op. Serv. 5781,
98 Daily Journal D.A.R. 8053
 RESOURCE INVESTMENTS, INC. a Washington corporation; Land
Recovery, Inc., a Washington corporation,
Plaintiffs-Appellants,
v.
U.S. ARMY CORPS OF ENGINEERS; James D. Green, Project
Manager, U.S. Army Corps of Engineers; Donald T. Wynn,
Colonel, District Engineer, U.S. Army Corps of Engineers;
Bartholomew B. Bohn, II, Colonel, Acting Division Engineer,
U.S. Army Corps of Engineers; Russell L. Fuhrman, Major
General, Director of Civil Works, U.S. Army Corps of
Engineers; Joe N. Ballard, Lt. General, Acting Chief of
Engineers, U.S. Army Corps of Engineers; H. Martin
Lancaster, Assistant Secretary of the Army for Civil Works;
Togo D. West, Jr., Secretary of the Army, Defendants-Appellees.
 No. 97-35934.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 4, 1998.
Decided July 27, 1998.
 
 Daniel D. Syrdal, Heller, Ehrman, White and McAuliffe, Seattle, Washington, for plaintiffs-appellants.
 John A. Bryson, United States Department of Justice, Washington, DC, for defendants-appellees.
 Rodney L. Brown, Jr., Marten & Brown, Seattle, WA, for amici-curiae, Pierce County, WA, and the National Association of Counties.
 Lawrence R. Liebesman, Carriellen, Crowell, Linowes and Blocher, Silver Springs, Maryland, for amici curiae Nationwide Public Projects Coalition, Cobb County-Marietta (GA) Water Authority, West San Bernardino County (CA) Water District, Helix (CA) Water District, and Washington State Refuse and Recycling Association.
 Gary J. Smith, Beveridge & Diamond, Washington, DC, for amici curiae National Association of Home Builders, National Association of Realtors and National Association of Industries and Office Parks.
 Appeal from the United States District Court for the Western District of Washington; Robert J. Bryan, District Judge, Presiding. D.C. No. CV-96-05920-RJB.
 Before: THOMPSON and TASHIMA, Circuit Judges, and STAGG, District Judge.*
 DAVID R. THOMPSON, Circuit Judge:
 
 OVERVIEW
 
 1
 This case presents the question whether section 404 of the Clean Water Act (CWA), 33 U.S.C. § 1344, authorizes the United States Army Corps of Engineers (Corps) to require a landowner to obtain a dredge and fill permit from the Corps before constructing a municipal solid waste landfill on a wetlands site. We hold that the construction of a municipal solid waste landfill on a wetlands site is regulated by the Environmental Protection Agency (EPA) or states with solid waste permit programs approved by the EPA under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6941-6949a, not by the Corps under section 404 of the CWA. Accordingly, we reverse the district court's order upholding the Corps' decision to deny a permit and remand with instructions to vacate that decision.
 
 FACTS
 
 2
 Resource Investments, Inc. (RII), a private company, seeks to construct and operate a municipal solid waste landfill on a 320-acre site in Pierce County, Washington. The landfill would accept mixed municipal solid waste (residential, commercial, construction and demolition refuse and tires) generated in Pierce County, and have a net capacity of 19.7 million tons. The landfill would occupy 168 acres of the 320-acre site and require clearing, excavating, filling, and grading approximately 21.6 acres of the site's 70 acres of wetlands. The affected wetlands include 13.7 acres of forested wetlands, 6.1 acres of scrub-shrub wetlands, and 1.8 acres of emergent meadow wetlands. RII plans to mitigate the wetlands loss by creating, preserving, restoring and enhancing wetlands on a dedicated 85-acre wetlands mitigation area on the site.
 
 
 3
 RII's landfill would consist of eight 21-acre cells. The base of each cell would be excavated to form proper grades for the construction of a leak detection and collection system that would underlie each cell. The leak detection and collection system would include a gravel collection layer, followed by a two-foot layer of low-permeability soil and a synthetic liner to catch any leachate created by rainwater or other liquids passing through the municipal solid waste. Municipal solid waste would be placed on top of this liner system, followed by a cover system.
 
 
 4
 The proposed landfill is in compliance with the Tacoma-Pierce County Solid Waste Management Plan (County Waste Plan), which was prepared pursuant to Wash. Rev.Code § 70.95.080 (requiring each county in Washington to prepare a comprehensive solid waste management plan that identifies and considers ways to dispose of solid waste generated within its jurisdiction). The State of Washington's solid waste management plan was developed pursuant to the RCRA, 42 U.S.C. § 6943, which requires each state to develop a plan for the safe and environmentally-sound disposal of solid waste within its jurisdiction.
 
 
 5
 The County Waste Plan recognizes that Pierce County's only open landfill, Hidden Valley Landfill (operated by Land Recovery, Inc., an affiliated company of RII), is near capacity and was scheduled for closure in 1996. In order to extend the closure date, Pierce County has since 1993 long-hauled 40 percent of its solid waste via truck and rail to an out-of-county landfill in Eastern Washington. The County Waste Plan recommends an in-county solid waste landfill as the primary means for the disposal of waste that cannot be recycled, and encourages private sector efforts to deal with the county's landfill needs.[1] The County Waste Plan also recommends the use of long-hauling solid waste by rail to out-of-county landfills in Eastern Washington or Eastern Oregon if an in-county landfill cannot be completed. The County Waste Plan provides that a landfill site will be required in any solid waste disposal strategy that Pierce County chooses.
 
 
 6
 After buying the majority of the 320-acre site in 1988, RII applied for permits to construct the landfill. It received a conditional use permit from Pierce County and a solid waste handling permit from the Tacoma-Pierce County Health Department. In order to obtain the solid waste handling permit, RII was required to successfully demonstrate to the Tacoma-Pierce County Health Department that: (1) a practicable alternative to the proposed landfill that did not involve wetlands was not available; (2) the construction and operation of the landfill would not cause or contribute to violations of any applicable state water quality standard, violate any applicable toxic effluent standard or prohibition, jeopardize the continued existence of endangered or threatened species or critical habitats, or violate any requirement for the protection of a marine sanctuary; (3) the landfill would not cause or contribute to significant degradation of wetlands; and (4) steps had been taken to achieve no net loss of wetlands by first avoiding impacts to wetlands to the maximum extent practicable, then minimizing unavoidable impacts to the maximum extent practicable, and finally offsetting remaining unavoidable wetlands impacts through all appropriate and practicable compensatory mitigation actions. See Wash. Admin. Code § 173-351-130(4)(a).
 
 
 7
 RII also filed an application on August 8, 1990, with the Corps for a permit under section 404 of the CWA to discharge "dredged or fill material" into the navigable waters of the United States. Section 404 prohibits the discharge of "dredged or fill material" into the navigable waters of the United States, including wetlands, without a permit from the Secretary of the Army, acting through the Corps. See 33 U.S.C. § 1344.
 
 
 8
 After an extensive review, the Corps denied RII's application, on the grounds that RII had failed to demonstrate the unavailability of practicable alternatives for waste disposal that were less environmentally damaging, such as long-hauling Pierce County's solid waste by rail to out-of-county landfills, and that the proposed landfill was not in the public interest because it would cause significant degradation of wetlands and posed an unacceptable risk of groundwater contamination.
 
 
 9
 The district court affirmed the Corps' denial of RII's application for a permit on the ground that the Corps' decision was not arbitrary, capricious, contrary to law, or an abuse of discretion. This appeal followed.
 
 DISCUSSION
 
 10
 RII contends that the Corps lacked authority under section 404 of the CWA to require a dredge and fill permit because, under RCRA, 42 U.S.C. §§ 6941-6949a, the regulation of municipal solid waste disposal, including the disposal of municipal solid waste in landfills constructed on wetlands areas, lies solely with the EPA or states with solid waste permit programs approved by the EPA.
 
 
 11
 The resolution of this issue requires an interpretation of the CWA, 33 U.S.C. §§ 1341-1345, and the RCRA, 42 U.S.C. §§ 6941-6949a. We review issues of statutory interpretation de novo. See United States v. Trident Seafoods Corp., 92 F.3d 855, 862 (9th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 944, 136 L.Ed.2d 833 (1997). "We must read the statutes to give effect to each if we can do so while preserving their sense and purpose." Watt v. Alaska, 451 U.S. 259, 267, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981). "[W]hen two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective." Radzanower v. Touche Ross & Co., 426 U.S. 148, 155, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976) (quoting Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)). Although an agency's construction of a statute it is charged with enforcing is normally entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress, see United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 131, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), this deference does not extend to "agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice." Ashoff v. City of Ukiah, 130 F.3d 409, 411 (9th Cir.1997) (quoting Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)).
 
 A. Section 404 of the Clean Water Act
 
 12
 The Clean Water Act establishes a comprehensive regime to regulate "the discharge of pollutants into the navigable waters" of the United States. See 33 U.S.C. § 1251(a). Section 402 of the CWA prohibits the discharge of pollutants into navigable waters without a permit issued by the EPA under the National Pollution Discharge Elimination System (NPDES). See 33 U.S.C. § 1342. Section 404 of the CWA prohibits the discharge of "dredged or fill material" into navigable waters without a permit issued by the Corps. See 33 U.S.C. § 1344.
 
 
 13
 Congress gave the Corps the responsibility of regulating the discharge of dredged or fill material into navigable waters in recognition of the Corps' historical role under section 10 of the Rivers and Harbors Act of 1899 as the permitting agency for dredge and fill activities in the nation's navigable waters, see 33 U.S.C. § 403; 42 Fed.Reg. 37,122 (1977), and because the CWA includes the term "dredged spoil" in the CWA's definition of "pollutant," see 33 U.S.C. § 1362(6). The Conference Committee Report explained:
 
 
 14
 A major difference between the Senate bill and the House amendment related to the issue of dredging. The Senate Committee had reported a bill which treated the disposal of dredged spoil like any other pollutant. Pursuant to an amendment accepted on the Senate floor, dredged spoil disposal was made subject to a different set of criteria to determine any environmental effects. The House bill not only established a different set of criteria to determine the environmental effects of dredged spoil disposal but also designated the Secretary of the Army rather than the Administrator of the Environmental Protection Agency as the permit issuing authority. The Conference agreement follows those aspects of the House bill which related to the Secretary of the Army's regulatory authority....
 
 
 15
 ....
 
 
 16
 The Conferees were uniquely aware of the process by which dredge and fill permits are presently handled and did not wish to create a burdensome bureaucracy in light of the fact that a system to issue permits already existed.
 
 
 17
 Conf. Rep. No. 92-500 (1972), reprinted in 1 A Legislative History of the Water Pollution Control Act Amendments of 1972, at 177 (1973).[2]
 
 
 18
 The term "dredged material" is defined under the Corps' regulations as "material that is excavated or dredged from the waters of the United States." 33 C.F.R. § 323.2(c). The phrase "discharge of dredged material" is defined as "any addition of dredged material into, including any redeposit of dredged material within, the waters of the United States." 33 C.F.R. § 323.2(d)(1).
 
 
 19
 The term "fill material" is defined under the Corps' regulations as "any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody. The term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under section 402 of the Clean Water Act." 33 C.F.R. § 323.2(e). The phrase "discharge of fill material" is defined as follows:
 
 
 20
 The term discharge of fill material means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure in a water of the United States; the building of any structure or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, and other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; and artificial reefs.
 
 
 21
 33 C.F.R. § 323.2(f) (emphasis in original).
 
 
 22
 Although primary responsibility for regulating the discharge of dredged and fill material into navigable waters lies with the Corps, Congress directed the EPA to promulgate guidelines for the Corps' consideration of dredge or fill permit applications. See 33 U.S.C. § 1344(b). The guidelines provide that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). The guidelines create a presumption that practicable alternatives are available where the proposed discharge would occur on a special aquatic site (including wetlands) and is not water dependent, unless "clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3).[3] The regulations also provide that an alternative is practicable "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).
 
 
 23
 The regulations further provide that a dredge and fill permit will not be issued if the proposed discharge will cause or contribute to violations of any applicable state water quality standard, violate any applicable toxic effluent standard or prohibition, jeopardize the continued existence of endangered or threatened species or critical habitats, violate any requirement for the protection of a marine sanctuary, or cause or contribute to significant degradation of wetlands. See 40 C.F.R. § 230.10(b), (c).
 
 
 24
 If the Corps finds that the application complies with these guidelines, the permit "will be granted unless the district engineer determines that it would be contrary to the public interest." 33 C.F.R. § 320.4(a)(1). The public interest review evaluates "the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest," id., and includes consideration of the impact of the proposed activity on wetlands, see 33 C.F.R. § 320.4(a)(3).
 
 B. Resource Conservation and Recovery Act
 
 25
 The Resource Conservation and Recovery Act of 1976 (RCRA), as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6941-6949a, establishes a comprehensive regime for the regulation of solid and hazardous waste disposal on land. See Ashoff v. City of Ukiah, 130 F.3d 409, 410 (9th Cir.1997). RCRA gives the EPA authority to issue permits for the disposal of solid waste, but allows the states to substitute their own permit programs for the federal program if the state program is approved by the EPA. See United States Dep't of Energy v. Ohio, 503 U.S. 607, 611, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992).
 
 
 26
 Congress directed the EPA to promulgate regulations for the safe and environmentally-sound disposal of solid waste, including requirements for the siting, design, construction, operation and closure of solid waste landfills. See 42 U.S.C. § 6942. In response, the EPA promulgated regulations ("Subtitle D regulations") providing minimum federal criteria with which all solid waste landfills must comply. See 40 C.F.R. §§ 258.1-258.75. The RCRA requires each state to adopt and implement a permit program which ensures compliance with these minimum federal criteria, see 42 U.S.C. § 6943; 40 C.F.R. § 258.1(a), and directs the EPA to determine whether each state has developed an adequate program, see 42 U.S.C. § 6947.
 
 
 27
 Under the EPA's Subtitle D regulations, wetlands are given strong protection against degradation by solid waste landfills. A new municipal solid waste landfill cannot be constructed on a wetlands area unless the owner can make several demonstrations to the director of an approved state.[4] First, the owner must clearly rebut the presumption that a practicable alternative to the proposed landfill is available that does not involve wetlands. See 40 C.F.R. § 258.12(a)(1). Second, the owner must show that the construction or operation of the landfill will not cause or contribute to violations of any applicable state water quality standard, violate any applicable toxic effluent standard or prohibition, jeopardize the continued existence of endangered or threatened species or critical habitats, or violate any requirement for the protection of a marine sanctuary. See 40 C.F.R. § 258.12(a)(2). Third, the owner must demonstrate that the landfill will not cause or contribute to significant degradation of wetlands. See 40 C.F.R. § 258.12(a)(3). Fourth, the owner must demonstrate that steps have been taken to achieve no net loss of wetlands by first avoiding impacts to wetlands to the maximum extent practicable, then minimizing unavoidable impacts to the maximum extent practicable, and finally offsetting remaining unavoidable wetlands impacts through all appropriate and practicable compensatory mitigation actions. See 40 C.F.R. § 258.12(a)(4). These RCRA wetlands provisions mirror the EPA's section 404 guidelines concerning wetlands under the CWA. See 40 C.F.R. § 230.10.
 
 
 28
 The EPA approved the State of Washington's municipal solid waste landfill permit program in 1994. See 59 Fed.Reg. 15,203 (1994). Under the State of Washington's permit program, an owner of a proposed municipal solid waste landfill must make the exact demonstrations required by the EPA in the Subtitle D regulations. See Wash. Admin. Code § 173-351-130(4)(a). The State of Washington has delegated its permit authority in Pierce County to the Tacoma-Pierce County Health Department. See Wash. Admin. Code § 173-351-720(1)(f).
 
 
 29
 In granting RII's application for a solid waste handling permit, the Tacoma-Pierce County Health Department certified that RII successfully made the appropriate demonstrations concerning wetlands under Wash. Admin. Code § 173-351-130(4)(a).
 
 C. Analysis
 
 30
 We conclude as a matter of law that the Corps lacked authority under section 404 of the CWA to require RII to obtain a permit from the Corps before constructing the solid waste landfill.
 
 
 31
 First, the municipal solid waste that would be disposed of in the proposed landfill does not fall within the definition of either "dredged material" or "fill material." The solid waste is not dredged material because it is not "material that is excavated or dredged from waters of the United States." See 33 C.F.R. § 323.2(c). The solid waste is not fill material because it is not "material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody." See 33 C.F.R. § 323.2(e). In fact, solid waste falls directly within one of the exceptions listed in the definition of fill material: "The term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under section 402 of the Clean Water Act." Id. In explaining this exception, the Corps stated:
 
 
 32
 During the two years of experience with the Section 404 program, several industrial and municipal discharges of solid waste materials have been brought to our attention which technically fit within our definition of "fill material" but which were intended to be regulated under the NPDES program. These include the disposal of waste materials such as sludge, garbage, trash, and debris in water. In some cases involving the disposal of these types of material in water, the final result may be a landfill even though the primary purpose of the discharge is waste disposal.
 
 
 33
 The Corps and the Environmental Protection Agency feel that the initial decision relating to this type of discharge should be through the NPDES program. We have, therefore, modified our definition of fill material to exclude those pollutants that are discharged into water primarily to dispose of waste.
 
 
 34
 42 Fed.Reg. 37,122 (1977).
 
 
 35
 Moreover, the layers of gravel and low-permeability soil, as well as the synthetic liner that would underlie the solid waste in RII's proposed landfill, do not constitute fill material because their primary purpose is not to replace an aquatic area with dry land or to change the bottom elevation of a waterbody, see 33 C.F.R. § 323.2(e), but rather to serve as a leak detection and collection system.
 
 
 36
 Second, the siting, design and construction of a solid waste landfill on a wetlands area is specifically regulated under the RCRA by the EPA and states with solid waste permit programs approved by the EPA. The Corps' interpretation of its jurisdiction under section 404 of the CWA is unreasonable because it creates a situation in which the Corps on the one hand, and an RCRA-approved state regulatory program on the other, would make the same wetlands-impact determinations, using the same criteria, with potentially inconsistent results. This regulatory overlap is inconsistent with the Corps' own regulations, which provide that "[t]he Corps believes that state and federal regulatory programs should complement rather than duplicate one another." 33 C.F.R. § 320.1(a)(5).
 
 
 37
 The Corps expressed its concern with such overlapping regulations in a March 19, 1984 letter from William R. Gianelli, the Assistant Secretary of the Army for Civil Works, to William Ruckelshaus, the Administrator of the EPA:
 
 
 38
 This follows up on discussions our agencies have had over the years about the proper way to regulate garbage disposal and other waste disposal in waters of the United States.
 
 
 39
 ....
 
 
 40
 EPA has many solid waste responsibilities under its RCRA programs and has developed expertise in that area. Army has very limited expertise. Hence, we would have to establish duplicative expertise which may well result in policies and technical decisions which differ from those of EPA. It would not be in the best interests of Government for EPA to work with the States under RCRA under one policy and Army to operate a 404 permit program for garbage disposal on a different basis. It is logical to identify regulations of garbage disposal with EPA's current and historic mission. It strains reason to have the Army Corps of Engineers, with its primary military and navigation missions, to lead this garbage disposal regulation.
 
 
 41
 This letter was ultimately followed by a 1986 Memorandum of Agreement between the EPA and the Corps regarding which agency would have interim jurisdiction over the disposal of solid waste until the EPA promulgated final rules to implement the RCRA. The Memorandum of Agreement provides that when the EPA promulgates its final rules, which it did on October 9, 1991, the responsibility for the program becomes the sole purview of the EPA and the affected states. See 51 Fed.Reg. 8871 (1986).
 
 
 42
 As one might surmise from the foregoing discussion, section 404 of the CWA and the applicable provisions of the RCRA can be harmonized to give effect to each "while preserving their sense and purpose." Watt, 451 U.S. at 267, 101 S.Ct. 1673. Accordingly, we hold that when a proposed project affecting a wetlands area is a solid waste landfill, the EPA (or the approved state program), rather than the Corps, will have permit authority under the RCRA. If the project that will affect a wetlands area is not a solid waste landfill and the project involves the discharge of dredged or fill material, the Corps will have permit authority under section 404 of the CWA. See Trident Seafoods Corp., 92 F.3d at 862 (stating that statutes should be harmonized if possible). This harmonization is consistent with the sense of the CWA that discharges of solid waste materials are beyond the scope of section 404, see 42 Fed.Reg. 37,122 (1977), and avoids unnecessary duplication of federal and state efforts in the area of wetlands protection.
 
 CONCLUSION
 
 43
 The Corps lacks authority under section 404 of the CWA to require a landowner to obtain a dredge and fill permit from the Corps before constructing a municipal solid waste landfill on a wetlands site. The construction of a municipal solid waste landfill on a wetlands site is regulated by the EPA and states with solid waste permit programs approved by the EPA under RCRA. Accordingly, we reverse the district court's order upholding the Corps' decision denying RII's application for a section 404 permit and remand with instructions to vacate the decision of the Corps.
 
 
 44
 REVERSED AND REMANDED with instructions to vacate the decision of the United States Army Corps of Engineers.
 
 
 
 *
 Honorable Tom Stagg, Senior United States District Judge for the Western District of Louisiana, sitting by designation
 
 
 [1]
 Although under Washington law, counties are responsible for the collection and disposal of municipal solid waste, see Wash. Rev.Code § 70.95.020, counties may contract with private entities for solid waste handling, see Wash. Rev.Code § 36.58.040
 
 
 [2]
 Under section 13 of the Rivers and Harbors Act of 1899, the Corps also had authority to regulate the discharge of pollutants and other refuse matter into the navigable waters of the United States. See 33 U.S.C. § 407. However, this permit authority was superseded by section 402 of the CWA in the 1972. See id.; 42 Fed.Reg. 37,122 (1977)
 
 
 [3]
 A project is not "water dependent" if it "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose." 40 C.F.R. § 230.10(a)(3)
 
 
 [4]
 "Director of an approved State" means "the chief administrative officer of a State agency responsible for implementing the State municipal solid waste permit program." 40 C.F.R. § 258.2